761 So.2d 629 (2000)
Frederick DOMONTER
v.
C.F. BEAN CORPORATION.
No. 99-CA-1204.
Court of Appeal of Louisiana, Fifth Circuit.
April 25, 2000.
Rehearing Denied May 22, 2000.
*632 Alan K. Breaud, Breaud & Lemoine, Lafayette, for Appellant C.F. Bean Corporation.
Lawrence Blake Jones, David C. Whitmore, Scheuermann and Jones, New Orleans, for Appellee Frederick Domonter.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SOL GOTHARD and JAMES L. CANNELLA.
CANNELLA, J.
Defendant, C.F. Bean Corporation, and plaintiff, Frederick Domonter, appeal from a judgment in a maritime personal injury case. We amend in part and affirm as amended.
On December 18, 1993, plaintiff was employed as a deckhand on the dredge, Proteus, a vessel that contains a large piece of equipment for digging and removing mud from waterways, similar to a backhoe. The dredge was constructed by defendant at its land based plant and moved by waterway to Racoon Island, 8 miles from shore. Crew members arrived and departed from the vessel by boat. This was plaintiff's first job as a deckhand, although he had previously worked for defendant as a manual laborer in the yard. Plaintiff's duties included cleaning the decks, particularly the upper deck, which would become muddy from the dredging. Around midnight on December 18, 1993, plaintiff had completed washing the upper deck and was descending from the upper deck with a bucket of dry soap in one hand when he claims that he twisted and fell when his foot caught in a piece of loose burlap, which was wrapped around the first few steps. He was not using the handrail at the time. A co-worker, Michael Brock, *633 saw him sitting on the landing of the staircase, but did nothing until plaintiff realized that he was in pain. Michael Brock obtained help and plaintiff was assisted into the engine room, where plaintiff stayed until the crew boat arrived to take the workers to their sleeping barge. The incident was reported to the Captain. Later that day, plaintiff was taken to the dock so he could seek medical treatment pain to his back, neck and right knee. Plaintiff eventually underwent two lumbar surgeries. He had not returned to work at the date of trial.
Plaintiff filed suit for his injuries on January 20, 1995 under the Jones Act, 46 U.S.C.App. § 688 (1994), for unseaworthiness and for maintenance and cure. Trial was held on March 24, 1998 and April 20-24, 1998. In a judgment rendered on May 14, 1998, the trial judge found that plaintiff suffered the injury to his back while aboard the vessel, that the vessel was unseaworthy and that defendant was negligent because the stairs were wrapped improperly with burlap creating a glove-like situation into which plaintiffs boot slid. The trial judge found defendant to be 70% at fault in the accident and plaintiff to be 30% at fault. She awarded plaintiff $25,000 for past pain and suffering and $62,000 for future pain and suffering, (a total of $87,500), after reducing it from $125,000 for plaintiffs comparative fault. Because plaintiff failed to seek work at any time since he was released to return to work in July of 1996, the trial judge concluded that he failed to mitigate his wage loss and reduced his past lost wages of $72,186 by 50% for 21 months. She awarded plaintiff a total of $57,610 for past lost wages. The trial judge also found that plaintiff did not intend to find work and thus, failed to mitigate his future wage loss. Thus, she reduced his future lost wages of $365,818 by 60%, resulting in an award of $146,327.20. The trial judge awarded plaintiff $80,488.07 for his past medical expenses. No mention was made regarding a reduction for plaintiffs comparative fault for past lost wages, future lost wages or past medical expenses.
On appeal, defendant asserts that the trial judge erred in finding plaintiff sustained an accident aboard the vessel, that defendant breached any duty to plaintiff and that the injuries were caused by an on-board accident. Defendant further asserts that the trial judge erred in failing to assess a greater percentage of fault against plaintiff, in failing to reduce the medical expenses by the percentage of plaintiffs fault and in awarding pre-judgment interest. Alternatively, defendant asserts that the trial judge erred in awarding pre-judgment interest from the date of the alleged occurrence, rather than from the date of judicial demand.
Plaintiff answered the appeal. Plaintiff requests that his percentage of fault be reduced and that the awards for pain and suffering and lost future wages be increased.

APPEAL BY DEFENDANT
In a seaman's case brought in state court, the federal substantive law applies. Prejean v. Industrial Cleanup, Inc., 98-0948 (La.12/1/98), 721 So.2d 1273.

Jones Act Negligence and Unseaworthiness
The Jones Act allows the seaman to sue his employer for negligence. 46 U.S.C.App. § 688 (1994). Seamen are allowed to bring their Jones Act claims in state court pursuant to the "saving to suitor" clause of the Judiciary Act of 1789. Foster v. Destin Trading Corp., 96-0803 (La.11/6/97), 700 So.2d 199, 209. In matters involving admiralty and maritime jurisdiction, the saving-to-suitor clause permits state courts to have concurrent jurisdiction with the federal district courts. Foster v. Destin Trading Corp., 700 So.2d at 209.
The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential *634 to recovery. Foster v. Destin Trading Corp., 700 So.2d at 208. The employer's negligence may arise in many ways, including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. Foster v. Destin Trading Corp., 700 So.2d at 208: Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977).
In determining a Jones Act case, the jurisprudence holds that both the employer and seaman are subject to a duty to exercise reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 338 (5th Cir.1997); Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La.1/20/99); 725 So.2d 474, 482; Foster v. Destin Trading Corp., 700 So.2d at 208. In Foster, the Supreme Court cited with approval the standard of care announced in Gautreaux, but alluded (as Gautreaux did) to the necessity only of "slight" evidence to meet the burden of proving the causation prong of the liability determination. This was followed in Vendetto v. Sonat Offshore Drilling Co., 97 3103 (La.1/20/99), 725 So.2d 474, 482. The Court in Vendetto stated:
Nevertheless, since the duty to provide a safe place to work allocates substantial risks of maritime employment to the employer, identical conduct is not demanded of the employer and the employee... The law allocates different risks to different parties, and that allocation forms parts of the reasonableness equation in the negligence determination. A defendant's standard of care, like that of the plaintiff, varies according to the conduct in which the party is engaged.
Vendetto v. Sonat Offshore Drilling Co., 725 So.2d at 479.
In regard to unseaworthiness, the owner of vessel has an absolute and nondelegable duty to furnish a seaworthy vessel. Foster v. Destin Trading Corp., 700 So.2d at 209. In Foster, the Louisiana Supreme Court stated:
This duty ... extends to a defective condition of the ship, its equipment, or appurtenances ... A ship's equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party....
A breach of the duty of seaworthiness gives rise to a claim for general damages. The plaintiff bears the burden of proving that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness....
The test for determining unseaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use... Unseaworthiness, then, is a relative term dependent on the circumstances. For example, a valve stem wrapped in duct tape created an unseaworthy condition because it could no longer be opened by hand, the intended method of operation, to regulate the flow of liquid cargo ... In contrast, an automatic valve that did not close completely did not constitute unseaworthiness when steam and hot water escaped from it and injured a worker. The court determined that its intended purpose was not to safeguard workers from escaping steam, but instead to maintain pressure inside the ship's boiler, and the automatic valve did not have to close completely to perform this function.... [Emphasis added]
Foster v. Destin Trading Corp., 700 So.2d at 209 [Citations omitted].
The unseaworthiness of a vessel results from a defective condition, not the result of an isolated negligent act. Foster v. Destin Trading Corp., 700 So.2d at 204; See: Meyers v. M/V EUGENIO C, *635 842 F.2d 815, 817 (5th Cir.1988). Furthermore, a plaintiff's own fault will proportionately reduce his recovery for injuries caused by the unseaworthiness of the vessel. Foster v. Destin Trading Corp., 700 So.2d at 204-05. Only if the seaman's own negligence was the sole cause of his injuries, will recovery be barred. Id.
In this case, plaintiff asserts that the dredge was unseaworthy and the employer negligent, because the burlap that was used to cover the stairs which he was descending when he fell, was placed improperly. He contends that the burlap was placed with the seam side up. That created a loose, glove-like piece of material, which caught his foot causing him to fall and land on his buttocks. Plaintiff testified that the burlap was placed there by another deckhand. The trial judge found that this condition existed, that it made the vessel unseaworthy and defendant negligent. She further found that plaintiff fell and was injured as a result of this condition.
At the time of the accident, the weather was cold. Plaintiff was wearing a jacket, shirt, pants, boots, hard hat and gloves. Plaintiff testified that the accident happened on the back stairway around midnight and that he had just finished scrubbing the upper deck. In a statement to defendant after the accident, plaintiff used the word "bow." However, plaintiff was a first time seaman and it was clear that he did not understand the nautical terminology. Plaintiff testified that, when he descended the stairway, he was not using the handrails. He said that he was carrying a bucket of dry soap in one hand and a broom in the other, although in his deposition he said that he was only carrying something in one hand. After he fell, he claimed that some soap spilled on the floor and that Johnny Walker (Walker), the mate and his immediate foreman, was angry about it. Plaintiff testified that Walker ordered the other deckhand to put the burlap on the back stairway. Plaintiff did not recall burlap being on the back stairs before that night and was surprised that the deckhand had completed the job so fast. Plaintiff testified that the burlap was ordered placed on the steps that night because oil was leaking on the surface of the upper deck. He did not know the name of the leaking equipment, but stated that the oil on the deck got so bad at times that he had to use a pellet type remover to absorb the oil. Plaintiff also stated that he cleaned a lot of water and mud from the upper deck. Furthermore, he said that the back, as well as the front, of the dredge, got very dirty. He noted that the burlap sacks were stored on the dredge and said that he helped remove them when they were needed.
After the accident, plaintiff said that he informed the mate that he tripped on the burlap. He also told the mate that he wanted to go to the doctor right away, but his transport was not immediately approved. Plaintiff said that he overheard the supervisor tell the mate that plaintiff would have to wait, because the transport boat driver was asleep and it would cost too much to wake the driver to take plaintiff to the hospital before the driver made his regular run. As a result, plaintiff was not taken to the hospital until 1:00 p.m. that day. Although another worker went with him, after plaintiff was discharged from the emergency room, he had to find his own transportation home to Breaux Bridge, Louisiana.
Harry Burgess (Burgess), one of the two Captains aboard the dredge, and plaintiff's supervisor, said that he reported to Captain Johnson Fail (Fail), although Fail testified that they had equal authority. Burgess testified that burlap was commonly used to cover the upper steps to keep oil from a leaking generator on the upper deck from being tracked to the deck below. He stated that he observed the use of the material for several weeks prior to the accident. Burgess said he had been off of the vessel for a few days and returned on December 19, 1993, after the accident. However, at that time, he noticed that *636 there was burlap improperly placed on one of the steps. Burgess also stated that plaintiff was a good worker.
Michael Brock, an oiler on the dredge, found plaintiff sitting on the landing after plaintiff fell. Michael Brock was on his way to the top deck by the back stairs when he observed plaintiff sitting at the bottom of the first flight of stairs. Plaintiff told him that he had slipped and fallen and indicated that he hurt his hip. Michael Brock informed his father, Glynn Brock, who worked on the dredge as a watch engineer. Glynn Brock told plaintiff's supervisor, Walker, and the men helped plaintiff into the engine room where he waited in the warmth until the transport boat arrived to take the men to the sleeping barge.
Glynn Brock testified that he knew plaintiff, but did not work directly with him. He stated that a deckhand's job was to keep the decks clean from the sand, mud and oil that accumulated on the decks. However, he stated that he remembered seeing the burlap only on the front stairs and thought it was placed there to prevent ice from forming due to the warm air blowing from both sides of the front engine room. Glynn Brock testified that no one reported to him that a generator was leaking oil, although he noted that at some point, at least one temporary generator was installed on the upper deck because of problems with the main generator. He did not know when that occurred. However, Glynn Brock claimed that the back stairs of the dredge did not get muddy because the dredging operation was performed on the front of the barge.
Michael Brock's job was to maintain oil in the engines. He testified that there was a temporary generator on the top deck at the time of the accident. When confronted with the logs, which indicated the temporary generator was obtained after the accident, he became unsure. However, on questioning by the trial judge, he stated that he remembered that the temporary generator was on the upper deck that night. Michael Brock also stated that the upper deck always had water on it. Although he did not remember seeing any soap on the floor or a bucket when he found plaintiff, he did not look around either. Further, he did not speak to plaintiff about the accident, other than to hear him complain of pain. Michael Brock did not recall seeing any burlap on the rear stairs, he only saw the material on the front stairs. However, in his deposition, he had stated that he did not remember if there was anything on the rear stairs.
Johnson Fail, the other Captain of the dredge, testified that he filled out an accident report, but was not there at the time. He arrived 6 hours later. Fail stated that plaintiff told him that he slipped or took a misstep. He noted that on December 16, 1993, plaintiff was told that his boots were slick and needed to be replaced. Because of that, he cautioned plaintiff to be careful, but kept him on the job anyway. Fail agreed that the boots would not have anything to do with plaintiff's fall if plaintiffs foot got caught in the burlap. Fail did not recall burlap on the rear stairs, but he said that the burlap placement was the mate's job. At one point, Fail stated that he told the mate to put the burlap on the lower steps on the forward deck because mud from the upper deck was a problem. At another point, Fail said that he did not know who placed the burlap on the stairs, as this was the responsibility of Burgess.
Fail testified that the digging operations caused pieces of mud to be slung onto the deck, and the burlap was intended to prevent workers from slipping on the stairs. Although Fail said there was no mud problem on the back because the dredge was on the front, he also agreed that mud could be tracked from the bank to the rear of the vessel, since the workers could get on and off from the back of the dredge. Fail noted that the back stairway had serrated edge grating, which was designed to prevent falls.
*637 Fail testified that the temporary generator was placed on the upper deck on December 29, 1993, after this accident. He confirmed this with the logs kept on board the dredge. However, he admitted that the upper deck contained hydraulics, which also used oil. Fail stated that the hydraulics were surrounded by a pan to catch any leaking oil, in order to prevent oil spills into the water. According to Fail, oil never overran the catch basin. Fail did not agree that burlap was used for ice problems on the steps. Further, he did not know of any problems with the generator before it was replaced later in the month. Fail agreed with Burgess that plaintiff was a good worker.
Stafford Angelle was the Chief Engineer on the Proteus at the time of accident. He testified that it had been his responsibility to fix any equipment that was leaking oil, but no one complained about an oil problem. He also testified that there was no temporary generator on the upper deck on the day of the accident, but both the hydraulics for moving the anchors and the dredge equipment used oil. However, he stated that a 4" barrier surrounded the hydraulics to contain any leaking oil. Although he agreed that the workers used burlap for trapping dirt and water, he contended that it was only used occasionally and only on the front stairs.
The appropriate standard of review in a Jones Act and unseaworthiness claim is the manifest error or the clearly wrong standard. Foster v. Destin Trading Corp., on rehearing, 96-0803 (La.5/30/97), 700 So.2d 199, 202. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Brown v. Seimers, 98-694 (La.App. 5th Cir.1/13/99), 726 So.2d 1018, 1021, writ denied, 99-0430 (La.4/1/99), 742 So.2d 556; Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether his conclusion was a reasonable one. Brown v. Seimers, 726 So.2d at 1021; Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Brown v. Seimers, 726 So.2d at 1021; Stobart v. State, Through DOTD, 617 So.2d at 882. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error, even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d at 844-45.
The trial judge found plaintiff's testimony to be credible, despite various small inconsistencies cited by defendant. Plaintiff is a barely literate, manual worker who had never worked on a vessel previously. Any inconsistencies he made were related to terminology, not substance. Furthermore, although defendant relied heavily on the logs to show that there was no oil on the upper deck, thus, no burlap on the stairs, the evidence showed burlap was commonly used, whether for oil, ice or mud. Further, the trial judge properly made credibility determinations relative to where the burlap was placed that night and chose to believe plaintiff's version. Based on the evidence, we find no manifest error in the trial judge's conclusion that there was burlap on the stairs, that the burlap was placed improperly and that it caused plaintiff to fall and injure himself. We further find that the trial judge was not clearly wrong in determining that the improper placement of the burlap created an unseaworthy condition and that it further constitutes Jones Act negligence on the part of defendant.

*638 Apportionment of Fault
The trial judge found defendant to be 70% at fault and plaintiff 30% at fault in the accident. Although plaintiff had a duty to use reasonable care, we find that defendant owed a greater duty to provide a safe working environment. Vendetto v. Sonat Offshore Drilling Co., 725 So.2d at 482. However, plaintiff cannot escape a fault finding. He admitted that he was not using handrails, or looking where he was going. Thus, based on the evidence, we find no manifest error in the apportionment of fault by the trial judge.

Causation
Defendant asserts that plaintiff failed to prove that his back injury was caused by the fall, or that the surgeries were medically necessary.
When plaintiff went to the Terrebonne General Hospital emergency room, he was examined for low back, neck, buttock, pelvis and right knee complaints. A contusion on his hip was found, but the various X-Rays were negative. He was advised that he could return to work within 5 days, but if he continued to have problems to see his family doctor. Plaintiff did not return to work. Since he had no family doctor, he did not seek further treatment until his pain worsened.
Plaintiff subsequently went to Our Lady of Lourdes Hospital in Lafayette, Louisiana, near his home and in February of 1994, plaintiff went to Dr. David Jarrott, a neurosurgeon in New Orleans. Plaintiff exhibited muscle spasms and tenderness on examination. Dr. Jarrott diagnosed plaintiff with a cervical lumbar sprain, acute muscle spasms in the back and severe anxiety. He continued to be treated by Dr. Jarrott throughout 1994, and between visits also saw Dr. Louis Blanda, who was closer to his home. In May of 1994, plaintiff underwent a cervical Magnetic Resonance Imaging (MRI) ordered by Dr. Blanda, which was normal. However, in September of 1994, an MRI of the lumbar spine was taken, which showed a mild disc rupture, suspicious for displacement of the L5-S-1 nerve root. Drs. Blanda and Jarrott and the radiologist agreed on this finding. As a result, Dr. Jarrott performed a micro-surgical laminectomy and discectomy on December 7, 1994 and plaintiff spent the next 3 days in the hospital. When plaintiffs spine was viewed during surgery, Dr. Jarrott confirmed his suspicion that the S-1 nerve was impinged. Also, plaintiffs knee continued to cause him pain.
Plaintiff saw Dr. Jarrott in January of 1995, complaining that his knee was swollen and he was still having back pain, which the doctor thought was post-operative pain. Dr. Jarrott noted that the knee would eventually require an operation. Plaintiff was treated conservatively, but the back pain continued and another MRI on July 18, 1995 showed a broad-based left side disc herniation at L-5. Dr. Jarrott diagnosed plaintiff with a "recurring" rupture. This was the direct result of the failure of the first operation and is not an unusual development following micro-surgery.
Conservative treatment continued. By September of 1995, plaintiff was still having muscle spasms and limited motion in his back. Plaintiff failed to improve between September of 1995 and March of 1996. As a result, Dr. Jarrott performed a second surgery on March 6, 1996 to correct the instability in plaintiffs spine that had developed after the first surgery. The second surgery revealed that plaintiff had a clear need for a fusion, so Dr. Jarrott performed another laminectomy and fusion. Plaintiff was discharged from the hospital after 4 days. Dr. Jarrott assessed plaintiff with a 20% whole body disability and noted plaintiff cannot lift heavy objects, bend, climb, or carry over 25 lbs.
Plaintiff last saw Dr. Jarrott on July 18, 1996. At that point, Dr. Jarrott could not offer any further surgical remedies. According to the doctor, plaintiff misunderstood this statement and did not return *639 because he though Dr. Jarrott could not offer him any further treatment. Dr. Jarrott testified that he envisioned a recovery period of approximately 18 months after the fusion, including 1 year of actual disability and 6 months of rehabilitation. Dr. Jarrott related the back condition and surgeries to the accident in December of 1993. He stated that the emergency report from Terrebonne General Hospital was consistent with a fall down stairs.
After reviewing the evidence, we find that the chronology of events supports the trial judge's conclusion that the fall caused plaintiff's back problems. Plaintiff immediately exhibited complaints related to the fall and sought treatment as the pain and symptoms developed, according to his financial ability. In addition, the question of whether the surgeries were medically necessary was answered when the doctor viewed the site during each of the two surgeries. In both instances, Dr. Jarrett stated that he saw the impingement and/or herniation causing the instability. The issue of what tests should have been done became moot. Thus, we find that the trial judge did not err in finding that the fall caused plaintiffs injuries.

Past Lost Wages
We first note that in plaintiffs appeal brief, he asserts that the trial judge used the wrong return to work date and should have awarded the past wages from September of 1997, according to Dr. Jarrott's testimony. Plaintiff also argues that the trial judge erred in finding that he failed to mitigate his damages. Plaintiff filed an answer to the appeal, but did not include this request for modification in the answer. La.C.C.P. art. 2133 states:
A. An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer. ...
When a party files an answer to the appeal, as opposed to following the formalities of an appeal under La.C.C.P. art. 2121, et seq., the scope of review is limited to the claims stated in the answer. Muse v. Dunbar, 97-582 (La.App. 3rd Cir.6/10/98), 716 So.2d 110, 118. In plaintiffs answer, he did not complain about the past lost wages amount. Furthermore, an argument in brief does not satisfy the requirement of appeal or answer to appeal, as a prerequisite to the Court's consideration of the issue asserted in brief. Vigh v. State Farm Fire & Cas. Ins. Co., 97-0381 (La.App. 4th Cir.11/19/97), 706 So.2d 480, 485; Arrow Fence Company, Inc. v. DeFrancesch, 466 So.2d 631, 633 (La.App. 5th Cir.1985), writ denied, 468 So.2d 575 (La.1985).
Defendant contends that the trial judge erred in failing to reduce the past lost wage claim by 30%, although she found that plaintiff was 30% at fault in the accident and reduced the general damages accordingly.
The trial judge reduced the past wages by 50% for plaintiffs failure to mitigate his damages, but failed to reduce the past lost wages by plaintiffs 30% fault. Because of the fault finding, the award should have been reduced by plaintiffs proportion of fault. The reduction for plaintiffs failure to attempt to obtain any type of work is separate and distinct from the reduction for fault. The reduction for plaintiffs fault must be made for all of plaintiffs damages, except cure. Thus, we will amend the judgment to that effect and reduce the past lost wages to $40,327.[1]

*640 Maintenance and Cure
"Maintenance and cure" is an ancient duty imposed upon the owner of a ship to provide food, lodging and necessary medical services to seamen who become ill or injured during service to the ship. Burgess v. C.F. Bean Corp, 98-3072 (La. App. 4th Cir.8/18/99), 743 So.2d 251; Comeaux v. Basin Marine, Inc., 93-1624 (La. App. 1st Cir.6/24/94), 640 So.2d 833, 836, writ denied, 94-2307 (La.11/18/94), 646 So.2d 386; Davis v. Odeco, Inc., 18 F.3d 1237, 1245 (5th Cir.1994), cert. denied, 513 U.S. 819, 115 S.Ct. 78, 130 L.Ed.2d 32 (1994). Recovery is not dependant upon negligence of the vessel or the owner and the burden of proof in seeking maintenance and cure is relatively light. Id. In addition, generally, a seaman need only prove that the injury arose during his service of the vessel. The seaman does not have to prove a causal connection to his duties. Liner v. J.B. Talley and Company, Inc., 618 F.2d 327, 332 (5th Cir. 1980); Burgess v. C.F. Bean Corp, supra; Comeaux v. Basin Marine, Inc., 640 So.2d at 836. The right to maintenance and cure exists regardless of fault. The remedy is essentially curative in nature and is not intended as compensation for injury. Boudreau v. S/V SHERE KHAN C, in rem, 27 F.Supp.2d 72, 83 (D.Maine 1998). The right to maintenance and cure arises from the employee-employer relationship. Aguilar v. Standard Oil Co., 318 U.S. 724, 731, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943) Thus, the liability of shipowner for maintenance and cure will be excused only by willful misbehavior or deliberate act of indiscretion on part of seaman. Aguilar v. Standard Oil Co., 318 U.S. at 731, 63 S.Ct. at 934; DiBenedetto v. Williams, 880 F.Supp. 80, 86 (D. Rhode Island 1995).[2]
Cure is payment of the seaman's medical, therapeutic and hospital expenses, until that point in time when plaintiff reaches maximum medical recovery. Fox v. Texaco, Inc., 97 2126 (La.App. 1st Cir.11/6/98), 722 So.2d 1064, 1067. Because it not fault based, but arises from the contractual relationship between the parties, defendant cannot avail itself of the apportionment of fault to reduce its liability for plaintiff's medical expenses. The award of medical expenses can be construed as compensation related to personal injury only when the defendant's actions in failing to pay maintenance and cure results in the worsening of a plaintiff's condition. Karim v. Finch Shipping Co., Ltd., 97-2518 (La.App. 4th Cir.8/26/98), 718 So.2d 572, 580. In this case, there was no evidence that plaintiff's condition was worsened or aggravated by defendant's refusal to pay cure. Thus, the trial judge did not err in refusing to reduce plaintiffs medical expenses, or cure, by 30%.

Pre-judgment Interest
Defendant contends that the trial judge erred in awarding plaintiff pre-judgment interest, or alternatively, in awarding pre-judgment interest from the date of the occurrence. Defendant contends that the trial judge was silent in her oral reasons regarding pre-judgment interest and that this Court should reform the judgment to reflect her intent. Further, defendant argues that plaintiff only prayed for interest *641 from date of judicial demand. Thus, we should award interest in conformity with that prayer.
In Olivier v. Best Workover, Inc., 94-994 (La.App. 5th Cir.1/30/96), 669 So.2d 476, 491, we stated that pre-judgment interest on a maritime claim is governed by general maritime law and that pre-judgment interest is awarded in a Jones Act claim when the claim of unseaworthiness and a claim under the Jones Act are tried together before a judge. The award of pre-judgment interest is discretionary and when it is awarded, the rule is that pre-judgment interest is awarded from the date of loss, for past damages. Olivier v. Best Workover, Inc., 669 So.2d at 491. Pre-judgment interest is not generally allowed on future unaccrued damages, which is awarded from the date of judgment.
In this case, the trial judge awarded pre-judgment interest on the past damages from the date of the occurrence. Defendant argues that her reasons for judgment do not reflect the award, thus, evidencing her intent to reject pre-judgment interest. However, neither oral nor written reasons constitute the judgment. Further, as the award is discretionary, we find the judge was not limited to the prayer. Thus, we find that the trial judge did not abuse her discretion in awarding pre-judgment interest, or in awarding it from the date of occurrence.

APPEAL BY PLAINTIFF

Pain and Suffering
The initial inquiry by the appellate court in determining whether a damage award should be modified, is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La. 1993). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Id.; Reck v. Stevens, 373 So.2d 498, 501 (La.1979).
Plaintiff asserts that the trial judge's initial award of $125,000 for this injury is inadequate. However, the record lacks any basis for this Court to increase the award. Plaintiff produced very little evidence as to how the injuries have affected plaintiffs life. Under these facts, we find that the trial judge did not abuse her great discretion in setting the amount of the award for pain and suffering.

Future Lost Wages[3]
Plaintiff submitted the testimony of Dr. Melvin Wolfson to prove his lost past and future wages. The trial judge accepted Dr. Wolfson's calculations, after finding that the figures used by defendant's expert were flawed. Dr. Wolfson calculated plaintiffs loss of future wages at $365,818. The trial judge reduced that amount by 60% for plaintiffs failure to mitigate, stating that it appeared to her that plaintiff did not intend to seek work.[4]
In Philippe v. Browning Arms Company, 395 So.2d 310, 319 n. 12 (La. 1980), the Louisiana Supreme Court stated that the doctrine of avoidable consequences bars recovery of damages which might have been averted by reasonable conduct on the part of the plaintiff, and that the standard is that of a reasonable man under like circumstances. See: Barsavage v. State Through Dept. of Transp. and Development, 96 0688 (La.App. 1st Cir.12/20/96), 686 So.2d 957, 963; Aisole v. Dean, 574 So.2d 1248, 1253-54 (La.1991). The burden of proof is on the defendant to *642 show to what extent plaintiff's damages should have been mitigated and the rule of mitigation of damages is to be applied with extreme caution. Walton v. Cooper/T. Smith Stevedoring, 97-0100 (La.App. 4th Cir.3/4/98), 709 So.2d 941, 950; Seagers v. Pailet, 95-52 (La.App. 5th Cir.5/10/95), 656 So.2d 700, 714.
Plaintiff stated that he failed to seek work following the accident because he did not think that there was anything he could do with his restrictions. Jobs that might have been available to him included kitchen work in a restaurant owned by a friend, but he claimed he could not perform that job because it involved lifting large pots. However, he did not try to do that job or any other type of work.
Dr. Neil Gorman, the vocational rehabilitation expert who evaluated plaintiff on two occasions, testified that because of plaintiff's low educational level and lack of skills, he would require some type of retraining or rehabilitation. He noted that a State run program generally takes a year to get into and plaintiff would need guidance to enter a private program.
Based on the testimony, the trial judge chose to believe that plaintiff could perform some type of sedentary work. After our review, we find that plaintiff did not act as a reasonable man and attempt either to find work or rehabilitation, nor did he indicate that he would do so in the future. Thus, we find that the trial judge did not err in reducing plaintiffs award for future lost wages by 60%.
Accordingly, the judgment of the trial court is hereby amended as to the award for past lost wages, which is reduced to $40,327 reflecting a reduction of 30% for plaintiffs comparative fault and otherwise affirmed as to liability, the apportionment of the percentages of fault, the awards for general damages, past medical expenses, future lost wages and pre-judgment interest.
Costs of appeal are to be paid by defendant.
AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] The judge reduced plaintiff's past lost wages by 50% for the 21 months between July 1996, the date of maximum medical improvement and the date of trial. The trial judge accepted Dr. Melvin Wolfson's figures of $72,186 for plaintiff's total past lost wages. After reducing the wages for 21 months by 50%, the trial judge concluded that plaintiff was entitled to past lost wages of $57,610. After our reduction for plaintiff's 30% fault, the award totals $40,327 for past lost wages.
[2] Maintenance is a form of compensation that arises out of the employment contract and is a daily stipend for living expenses, or an amount covering expenses for the cost of food and lodging that is equivalent to the food and lodging that he would have received on the vessel. Crane v. Diamond Offshore Drilling, Inc., 99-166 (La.App. 5th Cir.9/15/99), 743 So.2d 780; Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 94-95 (5th Cir.1985). Plaintiff testified that defendant has paid him $105 per week for maintenance until the date of trial. Maintenance is not an issue in this case.
[3] Plaintiff's issues relating to apportionment of fault and past lost wages have already been disposed of within the discussion of defendant's errors.
[4] The trial judge did not reduce the award by plaintiff's 30% fault, but defendant did not appeal this award. Thus, this issue is not before the Court.