| ¡..CANNELLA, Judge.
In this maritime case, the Defendant, the State of Louisiana, through the Department of Transportation and Development (DOTD), and the Plaintiff, Isaac Louis, both appeal from a judgment that found the Defendant 90% at fault and the Plaintiff 10% at fault in an accident on a ferry pontoon bridge. We affirm.
On March 23, 1999, the Plaintiff was working as a deck hand/toll collector on the ferry, M/V Feliciana, which crosses the Mississippi River at Luling on the west bank and at Edgard on the east bank. During a procedure to realign the apron of a pontoon bridge, a spinning winch handle struck his face and he sustained severe injuries to his teeth, jaw, and left eye.
The pontoon bridge is a movable barge that connects the ferry to the land. It has hinged aprons, one faces the vessel side and the other faces the landing side. In order to align the pontoon barge, the land side apron or ramp had to be lifted. This was done by using winches located on the down and upriver sides of the ramp. These winches are permanently fixed to the barge.
| ¡¡Several pontoon barges have been used at the Edgard location. On October 28, 1998, a set of smaller pontoon barges, including the one at issue in this case (304— 006), were sent to replace a set of larger barges. The larger barges were equipped with automatic land apron winches, which were started by pressing a button on an electric motor. However, the smaller pontoons’ winches were operated manually with the assistance of electric drills. This particular pontoon was never at the Ed-gard-Luling location prior to October of 1998.
When the smaller pontoon arrived, the Port Captain, Ronald Cooper, and the en *382 gineers, Brian LeBlanc (deceased at the time of trial), Julius Acklin (Acklin), and Frank Graffagnini inspected it and discovered numerous winch deficiencies. The defects on the winch used by the Plaintiff when he was injured included a missing spring on the dog, or pawl, and a missing dowel pin on the winch handle. The dog is a mechanical deidce that engages the teeth on the winch and prevents the winch from spinning out of control. When working properly, it locks the winch handle and prevents it from spinning, in the event that the brake fails and the load drops. It is a necessary piece of equipment because it allows the ramp, which is a heavy load, to be safely suspended while the ferry moves the barge. The spring on the dog is designed to hold it against the wheel and the dowel pin is supposed to be inserted in a hole to prevent the handle from slipping out of the winch while it is in use. In addition, the winch handle used by the Plaintiff was bent and the brake on that winch was not operating properly because the brake pads were worn and covered with grease. The winch brake is not designed to suspend a load, but to control and slow a descending load. On this winch, it failed regularly without warning, causing the apron to drop suddenly. In addition, two of the three electric drills used to crank the winches were not | ¿working. These problems, and other defects on the rest of the winches, were reported by Captain Cooper to the maintenance department at the Fleet Landing office. Prior to the accident, he made numerous written and oral complaints to maintenance about these defects. The Defendant did not replace or repair the defects. Nevertheless, the operation of moving this pontoon barge with- the defective equipment was not discontinued, even though Acklin thought it unsafe. Because of the weight of the ramp, the workers used a process of lifting the ramp with a front-end loader on a tractor that was normally used for realigning the dirt under the ramp. This was not an approved method of raising the apron, but was necessary because two of the three electric drills used to crank the winches were not working.
On the day of the accident, the chief engineer on duty, Acklin, selected the Plaintiff and another . deckhand, Landry Borne, to assist in lifting the land aprons. The ramp weighed about three and one-half tons and both apron winches were required to lift it. He ordered the Plaintiff to go to the upriver land-side winch. Acklin then activated the upriver land-side winch with the electric drill. He raised one corner of the ramp some distance from the ground. With the weight of the ramp and the force from the torsion suspended from the one winch, the only thing holding the weight was the brake, since the dog was missing its spring. Acklin and Borne then proceeded to the down-river winch to begin lifting the ramp so that the front-end loader could get under the ramp to lift it approximately eight feet. The Plaintiff was instructed by Acklin to remain by the upriver winch and to start cranking it only when there was slack in the cables as the front-end loader lifted the ramp. During this procedure, the brake failed, causing the ramp to fall and the Plaintiffs winch handle to spin out of control, striking him in the | ¡Jace. If the dog or brake had been working, the handle would not have spun around. He was subsequently taken to the hospital for his injuries.
A maritime suit for damages was filed, alleging the employer’s negligence under the Jones Act and the unseaworthiness of the vessel. Subsequently, the case was bifurcated for trial. Liability was tried on May 1, 3, and 4, 2000. On October 10, 2000; the trial judge found that the Defendant was negligent under the Jones Act, *383 the vessel was unseaworthy, and the negligence and unseaworthiness of the vessel were a proximate cause of the Plaintiffs injuries. He further found the Plaintiff to be 10% at fault and the Defendant 90% at fault.
On appeal, the Defendant asserts that the trial judge erred in finding it liable. Defendant first contends that the Plaintiffs own negligence was the superceding cause of the accident because the Plaintiff disobeyed an order not to crank until the cables had slack in them and by turning the crank that was under the heavy load, pulled the brake loose. Thus, the trial judge erred in finding it 90% at fault. The Defendant further asserts that the trial judge erred in his application of the seaman’s standard of care for his own safety by using a standard that has been overruled. Finally, it asserts that the vessel was seaworthy.
APPLICABLE LAW
In a seaman’s case brought in state court, federal substantive law applies. Prejean v. Industrial Cleanup, Inc., 98-0948 (La.12/1/98), 721 So.2d 1273; Domonter v. C.F. Bean Corp., 99-1204 (La.App. 5th Cir.4/25/00), 761 So.2d 629, 633, writ denied, 00-1872 (La.9/29/00), 770 So.2d 354.
JONES ACT NEGLIGENCE AND UNSEAWORTHINESS
The Jones Act allows the seaman to sue his employer for negligence. 46 U.S.C.App. § 688 (1994). Seamen are allowed to bring their Jones Act claims | fiin state court pursuant to the “saving to suit- or” clause of the Judiciary Act of 1789, which permits state courts to have concurrent jurisdiction with the federal district courts. Foster v. Destin Trading Corp., 96-0803 (La.11/6/97), 700 So.2d 199, 209; Domonter, 761 So.2d at 633.
Although the employer’s potential liability extends to all personal injuries arising during the course of the seaman’s employment, the Plaintiff must prove negligence in order to recover. Foster, 700 So.2d at 208; Domonter, 761 So.2d at 633. The negligence of the employer includes the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. Foster, 700 So.2d at 208; Domonter, 761 So.2d at 634; Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977).
In deciding a Jones Act case, the trial judge should determine the negligence of the employer according to the standard of a reasonable employer under like circumstances, and the negligence of the seaman according to the standard of a reasonable seaman under like circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 338 (5th Cir.1997); Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La.1/20/99); 725 So.2d 474, 482; Foster, 700 So.2d at 208. “However, a seaman need only present ‘slight evidence’ that his employer’s negligence caused his injuries in order to reach the jury or to be sustained upon appellate review.” Foster, 700 So.2d at 208; Gautreaux, 107 F.3d at 334-35. The Court in Vendetto stated:
Nevertheless, since the duty to provide a safe place to work allocates substantial risks of maritime employment to the employer, identical conduct is not demanded of the employer and the employee. The law allocates different risks to different parties, and that allocation forms parts of the reasonableness equation in the ^negligence determination. A defendant’s standard of care, like that of the plaintiff, varies according to the conduct in which the party is engaged. See also Argus v. Scheppegrell, 472 *384 So.2d 573 (La.1985)(when a doctor prescribed large amounts of drugs to a young patient known by the doctor to be a drug addict, the doctor was in a greatly superior position to avoid the risk of the patient’s death from a drug overdose, and was not allowed to defeat recovery, under the then rule of contributory negligence, by pleading the exact conduct by the patient that was the risk prompting imposition of the duty on the doctor not to prescribe large amounts of drugs). The determination of who had the duty to eliminate or minimize the risks of an injury-causing hazard is central to the negligence inquiry. The duty on the employer to make the work place safe may, in a sense, impose a greater duty on the employer than the duty on the seaman to use reasonable care for his own safety. But irrespective of the duty imposed, the standard of care on both an employer and a seaman is that of a reasonable person in the same position under like circumstances. [Citations omitted]
Vendetto, 725 So.2d at 479.
In a claim for unseaworthiness, the plaintiff must prove that the owner of vessel breached its absolute and non-dele-gable duty to furnish a seaworthy vessel. Foster, 700 So.2d at 209. A breach of the duty of seaworthiness gives rise to a claim for general damages. Id. In Foster, the Louisiana Supreme Court stated:
This duty ... extends to a defective condition of the ship, its equipment, or appurtenances ... A ship’s equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party ...
The plaintiff bears the burden of proving that “the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness ...”
The test for determining unseaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use ... Unseaworthiness, then, is a relative term dependent on the circumstances.
Foster, 700 So.2d at 209 [Citations omitted].
| sThe unseaworthiness of a vessel results from a defective condition, not the result of an isolated negligent act. Foster, 700 So.2d at 204; Domonter, 761 So.2d at 634. See: Meyers v. M/V EUGENIO C, 842 F.2d 815, 817 (5th Cir.1988).
Although a vessel may be unsea-worthy, the plaintiffs recovery for unseaworthiness will be proportionately reduced by his own fault, and recovery will be barred only if the seaman’s negligence was the sole cause of his injuries. Foster, 700 So.2d at 204-05; Domonter, 761 So.2d at 634-5.
STANDARD OF REVIEW
In reviewing a claim under the Jones Act and for unseaworthiness, the appellate court must determine if the factual findings of the trial court are manifestly erroneous, or clearly wrong. Foster, 700 So.2d at 202; Domonter, 761 So.2d at 637. As in any manifest error review, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Domonter, 761 So.2d at 637. The issue to be resolved by the reviewing court is whether the fact-finder’s conclusion was a *385 reasonable one, nor whether the factfinder was right or wrong. Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id. Only when the documents or objective evidence so contradicts a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness’s story, may the court of appeal find manifest error, even in a finding purportedly based upon a credibility determination. Domonter, 761 So.2d at 637.
I ^SUPERCEDING NEGLIGENCE
Defendant first contends that the Plaintiffs own negligence was the superceding cause of the accident because the Plaintiff disobeyed an order not to crank, until the cables had slack in them, and by turning the crank that was under the heavy load, pulled the brake loose.
The evidence shows, and the trial judge found, that it is unclear whether, at the time of the accident, the Plaintiff was cranking the handle when he should not have. First, the Plaintiff can neither read nor write. He has never had a driver’s license. Although he has worked on the river for the Defendant on the ferry system, his supervisors testified that he can only remember simple instructions and cannot be given more than one instruction at a time. Even then, he will sometimes forget and needs the instructions repeated. Acklin and Captain Cooper noted that they understand his mental limitations and work around them because he is a very good, dependable worker. Because he has done repetitive types of jobs on the ferry for many years, he can perform routine menial tasks.
This was supported by the testimony of Dr. F. William Black, a professor of psychiatry, neurology, and psychology, an expert in head injuries and their effects. He interviewed the Plaintiff for one hour and administered twenty different tests to him to determine his verbal, written, and motor skills. He testified that Plaintiff was able to respond to questions in simple words, but is unable to write. On the tests that he could understand and complete, he ranked mostly in the lowest percentile for his age. His intelligence quotient (IQ) is in the deficient range and he is functionally illiterate. His language functioning, recognition, and naming of objects ability shows that he is very deficient in expressive and receptive language skills. The Plaintiffs memory is very poor. He |inwas unable to perform the problem solving and abstract reasoning tests because he could not understand the instructions. The doctor found that the Plaintiff is significantly abnormal on the visual attention test, which could have been affected by his loss of vision in one eye. He also had trouble with verbal memory. The Plaintiff is significantly abnormal in visual spatial functioning because he did not know all of the numbers and letters. He is also significantly abnormal in constructional functioning, where he was asked to follow the dots and reproduce simple line drawings. The test for recall showed the same severe deficiency. Dr. Black stated that the Plaintiff has normal left-hand motor speed and dexterity, but abnormal responses on the right, his dominant side. He is abnormally slow in placing pegs into the holes in a pegboard.
Dr. Blank also tested for exaggeration and malingering. He concluded that the Plaintiff is not malingering. Those tests show that he has very abnormal delayed recall, but has normal immediate recall. However, if several to five minutes go by, he cannot remember what was presented to him. In his personality tests, the Plaintiff exhibited mild to moderate anxiety and *386 a moderate level of depression. He was unable to complete the Minnesota Multi-phasic Personality Inventory (MMPI) test, because he could not comprehend the nature of the statements presented to him and could not respond appropriately.
Dr. Black reviewed the Plaintiffs deposition and concluded that he will try to answer questions in the way that he thinks that they should be answered. However, he has difficulty answering questions. Although he does not remember what happened, he tries to answer using information that he was told by others, in order to please the questioner. He will not state that he does not know. He will not complain, nor will he refuse to do a job because of safety issues. His job is |ntoo important to him, so he does what he is told to do without question. Dr. Black concluded that the Plaintiff will give different answers to the same question if asked at different times, but he is not trying to deceive anyone. Furthermore, he is unable to do multiple tasks given in one instruction because he will become confused. The more steps in the instruction, the more trouble he will have in following all of the steps because it affects both his poor ability to understand complex instructions and also his poor delayed memory skills. Dr. Black testified that any testimony that the Plaintiff gives is unreliable. In addition, because of the various mental deficiencies, he is more likely to make mistakes in judgment. On the other hand, he has shown that he can successfully perform repetitive daily and typical jobs.
Plaintiff, who was 54 years old at the time of the accident, testified that he does not take any tolls because he cannot read. He works mostly in the engine room, cleaning. The Plaintiff stated that he follows orders or “they will write you up.” He knew that the winches were not working correctly on the day of the accident and knew that the spring on the dog on the upriver winch was missing. He testified that he put the bent handle in the center hole of the winch, because the correct hole was missing the pin. Putting the pin in the other hole would have made it easief to crank the winch. In describing the accident, the Plaintiff said that the brake “came down” and, even though he was using two hands, the handle went from an upright position to horizontal. The Plaintiff testified that, “He (presumably the front-end loader operator) was picking up at the same time as me. When I was cranking, he was picking it up.” The Plaintiff said that he was trying to level the ramp with Acklin’s side. He said it “took plenty of strength.” He could not remember if he used the upriver winch anytime before the accident.
112The Plaintiff lacks both communication skills and the ability to understand and execute multitask instructions. The testimony further shows that he could either have been working the winch when he should have waited, or winching the slack in coordination with the raising of the ramp as instructed. No one witnessed the accident and the Plaintiffs memory skills are highly unreliable according to Dr. Black. Thus, we agree with the trial judge that it is not clear whether the Plaintiff disobeyed his instructions, or even that he understood his instructions. Therefore, we do not find that the Plaintiffs negligence superceded the negligence of the Defendant.
UNSEAWORTHINESS
The Defendant asserts that the trial judge erred in finding the vessel un-seaworthy. After reviewing the evidence, we find that the vessel was clearly unsea-worthy. The Defendant knew of the numerous defects in the winch that the Plaintiff was ordered to operate, yet neglected *387 for five months to respond to the numerous requests made by the captain of the vessel to have the winch repaired. Every time that the wihch was used, there was a risk that the brake would fail, causing the load to drop. Although the Defendant attempts to focus the blame on the Plaintiff, because he did not obey the order to only crank the winch when there was slack in the lines, the evidence indicates that, even then, the operator was at risk of injury because the brake would occasionally fail without warning causing the pontoon to fall from six inches to more than one foot. If the brake failed when the operator was cranking, the handle would have been pulled spinning out of his hand. As one of the witnesses stated, this condition was an “accident waiting to happen.” Furthermore, the evidence also showed that the defects could easily have been corrected for minimal cost. A new winch would 11 shave cost less than $2,000.00 or the Defendant could have repaired the winch with replacement parts for less than $20.00. Thus, because these defects were not isolated conditions, but ongoing conditions that threatened the safety of the workers, the trial judge did not err in finding the vessel unseaworthy.
JONES ACT NEGLIGENCE
The facts in this case support the trial judge’s finding of negligence under the Jones Act. In addition to the facts cited above, the Defendant’s knowledge of the Plaintiffs limitations should have been a consideration as to where to place him in the movement operations. The Defendant, through its employees that worked with the Plaintiff over the years, knew that the Plaintiff was totally illiterate, had difficulty with multiple instructions, and had a short term memory problem, yet he was still ordered to work the dangerously defective winch. Thus, we find that the trial judge did not err in finding the Defendant liable for negligence under the Jones Act.
APPORTIONMENT OF FAULT
The Defendant contends that the trial judge erred in the standard of care he applied in regard to the seaman’s care for his own safety, that the Plaintiffs negligence was the predominant, active cause of his injury, and that the trial judge erred in the apportionment of fault.
In this case, the trial judge found that the Defendant was 90% at fault in causing the Plaintiffs injuries and that the Plaintiff was 10% at fault. We do not find manifest error with this finding.
The Plaintiff worked on ferries for more than 17 years. The evidence shows that he was able to do so because the captains and his co-workers understood his limitations, and because his jobs were generally repetitive. | uBecause he appears to have had some understanding of the dangers of working -with this pontoon, some fault must be allocated to him for his injuries. However, given the facts in this case, 10% is the highest percentage that could be allotted to this particular seaman, under these particular circumstances. Although the trial judge may have applied the wrong standard of care to the seaman (that his care for his own safety is slight) the error does not affect the conclusion. Although the Plaintiff had a duty to take reasonable care for his own safety, we find that the Defendant owed a greater duty to the Plaintiff to provide a safe working environment and that the breach of this duty was the primary proximate cause of the Plaintiffs injuries, not the Plaintiffs actions. See: Vendetto v. Sonat Offshore Drilling Co., 725 So.2d at 482. Thus, based on the evidence, we find no manifest error in the apportionment of fault by the trial judge.
*388 Accordingly, the judgment of the trial court is hereby affirmed. Costs of this appeal are to be paid by the Defendant.
AFFIRMED.