977 So.2d 117 (2008)
Harold YOUNCE
v.
PACIFIC GULF MARINE, INC. and ABC Insurance Company.
No. 07-CA-421.
Court of Appeal of Louisiana, Fifth Circuit.
January 22, 2008.
*121 Sean D. Alfortish, Attorney at Law, Kenner, LA, Wiley J. Beevers, Attorney at Law, Gretna, LA, for Plaintiff/Appellant, Harold Younce.
John H. Clegg, Attorney at Law, New Orleans, LA, for Defendant/Appellee-Second Appellant, Pacific Gulf Marine, Inc.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SUSAN M. CHEHARDY, and FREDERICKA HOMBERG WICKER.
SUSAN M. CHEHARDY, Judge.
This personal injury case has been before this Court repeatedly on applications for supervisory writs and on prior appeals. It now comes before us following a second bench trial on the merits. Both parties have appealed.
*122 On December 31, 1995, Harold Younce was a Jones Act seaman employed by Pacific Gulf Marine, Inc. (hereafter "PGM") as an able-bodied seaman aboard the M/V SUGAR ISLANDER. On that day he was injured in the course of his employment while engaged in off-loading CO2 (carbon dioxide) tanks from the ship onto a pier. He was serving as signalman to the winch operator. During the operation his left arm or jacket became caught on a metal cargo basket being used for the offloading and his left arm was pulled upward as the winch began to lift the basket. The injuries he sustained are the basis of this lawsuit.
HISTORY OF THE CASE
On January 2, 1998 Younce filed this lawsuit against PGM, alleging he sustained injuries to his left arm, left shoulder, neck, upper and lower back, and left knee. He sought damages under the Jones Act and general maritime law, as well as maintenance and cure. He also sought attorney's fees for arbitrary cessation of maintenance and cure payments.[1]
The case was originally tried in a bench trial in 1999, with judgment in favor of the plaintiff. On appeal this Court affirmed, but the Louisiana Supreme Court vacated the judgment on the basis the trial judge should have been recused, and remanded the matter for a new trial before a different judge.[2]
On remand, the matter was allotted to another judge. PGM filed reconventional demands against Younce and one of his attorneys. Younce and the attorney filed exceptions of prescription, which were sustained. On appeal the ruling was upheld by this Court.[3]
Thereafter PGM moved for summary judgment on the basis that Younce had forfeited his rights to maintenance and cure by intentional misrepresentation of his medical condition during a medical examination prior to beginning to work on the SUGAR ISLANDER. The trial court granted partial summary judgment and dismissed the claim for maintenance and cure. On appeal this Court reversed the summary judgment, finding there were genuine issues of material fact that precluded summary judgment.[4]
The case was retried on its merits for seven days in April 2006. On September 1, 2006, the district court rendered judgment, in which it found that PGM was negligent, that Younce was comparatively negligent, and that the parties were equally at fault.
With respect to causation of Younce's injuries, the court found that the neck and shoulder injuries were consistent with the facts of the accident and were established by credible medical evidence. However, the court found that the left knee and lumbar spine injuries were not attributable to this accident. The court concluded the knee injury was caused by other accidents that occurred prior to the incident on the SUGAR ISLANDER, and the lumbar spine pain manifested too long after this accident to be convincingly related.
*123 The court further found the vessel was not unseaworthy. The court concluded that neither the basket in which the plaintiffs arm/sleeve was caught, nor the negligence of his coworker Jack Hanley, created an unseaworthy condition. The court specifically found that the basket was reasonably suited for its intended use and that Hanley's negligence was an isolated act.
Finally, the court found the plaintiff was not entitled to maintenance and cure benefits beyond those he had already received from PGM. Thus, the issue of whether the plaintiff was entitled to attorney's fees for egregious denial of maintenance and cure was moot.
Based on its findings regarding causation, the court awarded the plaintiff medical expenses related to treatment of his shoulder and cervical spine injuries, less amounts paid by PGM as cure benefits.
With regard to the claim for loss of earning capacity, the court attributed one hundred percent of the plaintiffs lost wages to his shoulder and cervical spine injuries up to February 1997. After February 1997, the court found that fifty percent of the plaintiffs lost wages were attributable to his shoulder and cervical spine injuries.
The court concluded it would be inequitable to award pre-judgment interest against the defendant, and pointed out, "The specific peculiarities which pervaded this entire litigation are too numerous to mention, but we note they are well-reflected in the trial and appeal records." The court noted that the accident occurred more than ten years prior to the second trial; final judgment and appeal were delayed due to the case's multiple trips back-and-forth through the judicial system; after re-allotment and resetting for new trial, the parties were particularly contentious; and other events while the second trial was pending caused unusual delays and created peculiar circumstances. Based on the "extraordinary delay in reaching an ultimate trial judgment," the court held it would be inequitable for the defendant to pay prejudgment interest in this matter.
The court also noted it had previously ordered the parties to bear one-half the cost of the special master's expenses. The court declined to revisit that decision because the appointment of the special master was for the mutual benefit of the parties. The court also denied PGM's motion for sanctions for the plaintiff's failure to comply with discovery requests.
Based on the equal apportionment of fault between the plaintiff and PGM, the court awarded the plaintiff fifty percent of reasonable expert expenses as determined by the court, and assessed PGM its own costs.
The court awarded the plaintiff a total of $566,901.18, reduced by the plaintiff's fifty-percent fault, as follows:

 Summary of Damages
Pain and Suffering $250,000.00
Medical Expenses $ 50,255.10
 Louisiana Clinic $23,222.00
 Diagnostic Imaging Services 2,123.00
 The Wellness Center 4,081.00
 St. Charles General Hosp. 18,863.10
 Orleans Anesthesia Group 1,159.00
 Dr. Richard Meyer 218.00
 Radiology Consultants 139.00
*124
 Dr. Fortier-Benson 450.00
 __________
 $50,255.10
Lost Wages $266,646.08
TOTAL $566,901.18
Comparative Negligence (TOTAL x .5) $283,450.59
Costs ($5,790.00 x .5) $ 2,895.00
 Dr. Larry Stokes $ 1,040.00
 Dr. Amusa 1,200.00
 Matthew Slimming 450.00
 Dr. Randy Rice 300.00
 Commander Cole 400.00
 Dr. Watermeier +2,400.00
 ___________
 $ 5,790.00
TOTAL AWARD $286,345.59

Both the plaintiff and the defendant appealed.
FACTS
On December 31, 1995, Younce was a 36-year-old able-bodied seaman. He had served aboard the M/V SUGAR ISLANDER since October 1995. On the day of the accident, he was helping to prepare the ship for a Coast Guard inspection. The vessel was docked at Moorehead City, N.C.
Younce was helping to move C02 canisters. The crew first used a cargo net for the task, until one of the crew members suggested using a cargo basket that had been either discarded or abandoned on the dock. The basket had a steel gate on one end that was warped or deformed, so that the gate could not be closed easily. The workers had to exert pressure to pull the bent or warped metal back into line so a pin could be inserted through the eyelet openings to secure the gate closed while the canisters were being lifted.
Younce testified it had been raining and so he had to contort his body to maintain a firm foothold in order to exert pressure, and also to brace himself while using his hands and arms to pull the metal back into place. He hooked his armpit over the top of the basket in order to brace himself.
Just as Younce and a coworker, Jean Couvillion, were slipping the pin into place on one of the loads, the basket was suddenly raised by the winch operator, Jack Hanley, who was the chief mate employed by PGM aboard the vessel. Younce's arm was caught and wrenched upward. Younce testified he felt himself being lifted, and then fell to the deck, He claimed he went to his knees and grabbed his shoulder due to excruciating pain. In contrast, Couvillion said Younce never fell to his knees. Hanley testified he only looked away from the operation for a matter of seconds and when he looked back, Younce was running around the pier. Both Couvillion and Hanley testified that if Younce was lifted by the basket, it could only have been a few inches. The accident occurred in a matter of seconds, the winch was very slow-moving, and could not have lifted Younce to any great height. Hanley said the basket was only a few inches off the ground when he stopped raising it.
One of the contested facts was whether Younce, who was acting as signalman to the crane operator, had signaled to the third mate to lift the basket. Couvillion testified that he thought Younce made a "thumbs up" signal to Hanley. Hanley also testified that Younce gave him the signal to lift.
Younce was taken to the emergency room of Carteret General Hospital. After examination, the emergency room doctor released Younce "to home" and placed him *125 on restriction of "no heavy lifting." The doctor also prescribed Nalfon, a muscle relaxant. Upon returning to the vessel with his arm in a sling, Younce was allowed to stand watch on the gangway to see if he could "shake off" his injuries. He testified the Nalfon made him drowsy and unable to stand his watch.
On January 2, 1996 Younce went to the Carteret Clinic, where he was given a slip that stated he was not to return to work before January 7, 1996, and he was to undergo physical therapy. Fellow crew members Jack Hanley and Jeffrey Sutton testified it was obvious that Younce left the vessel to get medical attention and that he was in pain.
Younce testified that after leaving the vessel he did not immediately seek treatment because he still believed his injuries would resolve over time and he would be able to return to duty. He filled out a registration form with the Miami SIU office seeking employment on another mission.[5] He was offered the opportunity to sail, but did not do so because he felt he had not recovered from his injuries.
On March 6, 1996, Younce was first seen by Dr. John Watermeier, a New Orleans orthopedist. Dr. Watermeier ultimately found and diagnosed four separate injuries: a ruptured cervical disc; a rotator cuff tear in the left shoulder; a bruised bone and partial tear of the lateral meniscus of the left knee; and, in January 1997, degenerative changes in the lumbar back area with neural encroachment.
Eventually Younce underwent a two-level anterior fusion for the cervical injury and surgery for the rotator cuff tear, followed by arthroscopic surgery to his left knee, and later an anterior lumbar fusion to remove a disk in the lumbar spine and stabilize the spine. Younce claims he continues to experience pain in his lower back.
PGM denied the knee injury and the lumbar injury were related to the accident here. PGM pointed out that on the initial visit to Dr. Watermeier, Younce attributed his knee pain to a prior accident in August 1995, when he was employed by Waterman Steamship. (Dr. Watermeier sent the bills for treatment of the knee to Waterman.) Younce expressly denied having low back pain. He did not disclose an April 1995 cervical disc herniation and the successful physical therapy for that injury. Nor did he disclose to Dr. Watermeier that he had an intervening accident between the time of the SUGAR ISLANDER incident and when he was first examined by Dr. Watermeier.
Dr. Watermeier stated that Younce's left leg pain, numbness, and weakness in all medical probability resulted from nerve irritation stemming from a back injury which, in his opinion, resulted from trauma from the December 31, 1995 accident. However, when given opportunity to review medical reports issued at the time of the December 31, 1995 accident, and Younce's January 25, 1996 Registration to Return to Work, Dr. Watermeier revised his opinion on causation and stated he believed that Younce was ready to return to work as of January 1996. Dr. Watermeier also was unaware of an unreported incident, in which involved Younce "stepping in a hole." Dr. Watermeier testified that this type of an injury would cause injuries to his knee, back and neck. He could not rule out that the intervening accident may have caused Younce's neck problems. He could not testify with any degree of medical certainty that this was a superseding event. Dr. Watermeier said that after February 1997, he did not provide anything more than "palliative treatment" *126 for Younce's knee, shoulder and neck.
PGM terminated maintenance and cure payments after February 1997.
In November and December 1998, Younce lived at a mobile home park owned by the Churchill Group, where he performed property management supervision for various contractors and vendors who service the trailer park. He stated he had experience as an engineer in property management. His work included observing the contractors, monitoring their work, checking the out-of-state contractors' licenses, and making sure the contractors were paid. He also took bids, assessed the capacity of the contractors to perform the work, and investigated their capacity to complete tasks. To keep his unemployment benefits, he instructed his employers, "Due to union benefits, please list on payroll check Judy Gisclaire [his girlfriend] as manager." This job paid $800 to $900 per month. Younce believed that if there was written evidence that showed he was employed, it would jeopardize his benefits.
According to Dr. Watermeier, he never told Younce he could not return to work. In 1998, after the four surgeries, Dr. Watermeier provided functional limits for Younce. By the time of trial, however, those limits were not relevant; Dr. Watermeier said that Younce's recovery was good and he surpassed those functional limits.
Dr. Watermeier did not treat Younce from 1999 to 2003. Rather, Younce saw only pain management doctors, who gave him a variety of drugs upon which he became dependent. He stopped taking drugs in 2005. At the trial Younce testified his shoulder was "fine" and, outside of changes in the weather, his neck was "much better."
Dr. Thomas Purser treated Younce for a cervical disc injury 13 times between June 5, 1995 and July 30, 1995. Younce had severe neck spasms, and reduced left bicep and triceps reflexes. Dr. Pursuer diagnosed a herniated disc at C-5/C-6 on the left, with nerve root compression. Dr. Watermeier testified that Dr. Purser's records, which he did not have when he treated Younce, established objective evidence of a pre-existing herniated cervical disc. At trial, however, Younce denied that Dr. Purser ever treated him for neck and shoulder pain.
In addition, Dr. Watermeier did not have Younce's medical records from the SUGAR ISLANDER incident until trial. When he reviewed those at trial, he amended his opinion on causation. Previously he had stated that the SUGAR ISLANDER incident "aggravated" Younce's pre-existing neck problems. Now, after seeing that Younce made no contemporaneous complaints of neck pain at or near the SUGAR ISLANDER incident, and that Younce registered to go back to work on January 25, 1996, Dr. Watermeier believed that as of January 1996 Younce could return to work. He also believed there was no evidence that the SUGAR ISLANDER incident aggravated Younce's pre-existing neck injury.
Dr. Watermeier testified that board-certified orthopedists put greater weight on written medical reports than on a patient's description of events when there is a direct contradiction. The written medical reports show no complaints whatsoever of neck pain arising from the SUGAR ISLANDER incident.
In trial testimony Younce disclosed for the first time that he had an intervening accident. Following his departure from the SUGAR ISLANDER and his registration to return to work, but prior to seeing Dr. Watermeier, he stepped in a hole. He *127 claimed he reported this to Dr. Watermeier, but Dr. Watermeier denied that he was told about this incident. Dr. Watermeier concluded this accident could have injured Younce's neck.
Younce appeals the finding of comparative negligence against him, the determination that his low back and knee injuries were unrelated to this accident, the finding that the vessel was not unseaworthy due to the damaged cargo basket, the failure to award damages for future loss of earning capacity, and the failure to award pre-judgment interest and proper expert costs.
PGM appeals the award of damages attributable to Younce's neck injury, the award of future damages based on pre-tax earnings, and the failure to consider Younce's post-accident work experience.
LAW AND ANALYSIS
We note first that Younce has asserted both negligence and unseaworthiness as bases for recovery. Louisiana courts of appeal should apply the state manifest error standard of review in general maritime and Jones Act cases. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, 96.
In reviewing a claim under the Jones Act and for unseaworthiness, the appellate court must determine if the factual findings of the trial court are manifestly erroneous, or clearly wrong. As in any manifest error review, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The issue to be resolved by the reviewing court is whether the factfinder's conclusion was a reasonable one, [or] whether the factfinder was right or wrong. Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Only when the documents or objective evidence so contradicts a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, may the court of appeal find manifest error, even in a finding purportedly based upon a credibility determination. [Citations omitted.]
Louis v. State ex rel Dept. of Transp. and Development, 01-1334 (La.App. 5 Cir. 5/15/02), 819 So.2d 379, 384-385.
It is uncontested that Younce is a seaman under the Jones Act, 46 App. U.S.C. § 688, which allows an injured seaman to bring a negligence suit against his employer.
[Under the Jones Act,] [t]he employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure *128 comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. [Citations omitted.]
Foster v. Destin Trading Corp. (on rehearing), 96-0803 (La.5/30/97), 700 So.2d 199, 208.
The owner of a vessel has a duty to furnish a seaworthy vessel. This duty is absolute and nondelegable. It extends to a defective condition of the ship, its equipment, or appurtenances. A ship's equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party.
A breach of the duty of seaworthiness gives rise to a claim for general damages. The plaintiff bears the burden of proving that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."
The test for determining unseaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use. Unseaworthiness, then, is a relative term dependent on the circumstances.
Foster, 700 So.2d at 209. "Unseaworthiness results from a defective condition and is not the result of an isolated negligent act." Foster, 700 So.2d at 204.
1. Causation
Younce asserts the trial court committed manifest error in failing to find that his low back and left knee injuries were related to the accident of December 31, 1995.
PGM asserts the trial court erred when it found that Younce's neck injury was related to the incident aboard the SUGAR ISLANDER and not caused by Younce's unreported superseding accident.
We find no error in the trial court's determination on these issues. First, the court specifically stated that Younce's testimony lacked credibility. His medical records established he consistently attributed the knee injury to an accident that occurred in August 1995, prior to the SUGAR ISLANDER incident. Further, although Younce claimed the basket lifted him up several feet before he dropped to the ground, that testimony was contradicted by his co-workers, Couvillion and Hanley, neither of whom saw him drop, but rather said he was "running around" in pain after the incident. The court found the co-workers more credible than Younce, and we are unable to reverse that determination on the face of the record. Louis, 01-1334 at p. 8, 819 So.2d at 384-385.
Further, the court found Dr. Watermeier's testimony on the causation of the knee injury not credible, partly because Dr. Watermeier did not receive a complete history from Younce, which should have included the information that Younce stepped in a hole several weeks after the December 1995 incident. Dr. Watermeier, upon being told of this at trial, stated it would have affected his opinion had he known of it.
As to the neck injury, the court found it related to this accident because it had manifested by the time the plaintiff saw Dr. Watermeier on March 8, 1996. The court ruled it was consistent with the facts of this accident, and was established by credible medical evidence. PGM contends the court should have considered the neck injury, like the knee and back injuries, to be more likely the result of the intervening accident when Younce stepped *129 in a hole. Further, PGM points out that Younce had had cervical neck problems previously.
We find the trial court was not clearly wrong in attributing the neck injury to this accident. The evidence establishes that Younce had been treated by Dr. Thomas Purser, III for a cervical neck pain in June and July 1995. Dr. Purser determined that the problem was muscular rather than due to disk pathology, and the pain was fully resolved when Dr. Purser released Younce on July 30, 1995.
2. Comparative Negligence/Proximate Cause
Younce contends the trial court erred in using the wrong standard of law by failing to determine that Younce's negligence, if any, was a proximate cause of his accident. Younce asserts the trial court failed to find that his negligence was a proximate cause of his injuries, but only applied the "standard of ordinary prudence" of a reasonable seaman under the circumstances. He does not contest that the causation standard against PGM is "featherweight" or "the slightest negligence."
PGM asserts that a recent case has established that in Jones Act cases, negligence and comparative negligence must be determined with identical standards. In Norfolk Southern Ry. Co. v. Sorrell, 549 U.S. 158, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007), the United States Supreme Court held that in cases under FELA (Federal Employers' Liability Act), a single standard of causation applies when assessing both the negligence of the employer and the contributory negligence of the employee. Jones Act cases apply the standards of FELA.[6] Therefore, after the Norfolk Southern case, the standards for determining the negligence of a seaman and a vessel owner are identical. There is no different burden for establishing negligence.
Here, as found by the trial court, the shipowner's negligence was through the action of the chief mate, Hanley, in operating the winch before the seamen were clear of the basket, and in looking away momentarily from the operation on the pier. The plaintiff's negligence was in signaling Hanley to lift before he himself was clear of the basket.
Considering the above, we find no error in the trial court's determination that Younce was comparatively negligent at fifty percent.
3. Regulatory Violations
Younce contends the trial court committed manifest error when it failed to find that PGM violated 46 C.F.R. § 91.25-25 and as a matter of law, could not place any comparative fault on Younce. Specifically, he argues that PGM was required to have a certificate of inspection for the basket it used during the incident. He asserts that, without the certificate, PGM violated the regulation and thus cannot plead comparative fault.
As pointed out by PGM, the 1995 version of 46 C.F.R. § 91 (in effect at the time of this accident) included section 91.37-3, which defined and regulated "cargo gear." It limited the gear to "that part of the shipboard cargo gear used in connection with the loading and unloading" of cargo. It expressly excludes "material handling gear." The basket in question was neither an appurtenance of the vessel *130 nor was it "cargo gear." The vessel is a "gearless self-trimming bulk carrier"  that is, it has no "masts, booms, winches, cranes, elevators or conveyors" used for cargo operations. Instead, the SUGAR ISLANDER requires assistance with the use of shoreside cranes for loading and unloading cargo. It has no "cargo gear"; therefore, the U.S. Coast Guard regulations applicable to vessels that have cranes for loading cargo do not apply to the SUGAR ISLANDER.
Accordingly, we find no manifest error in the trial court's conclusion on this issue.
4. Unseaworthiness
Younce contends the trial court erred when it found that the cargo basket was defective, but not unseaworthy. He argues that had the cargo basket been fit for its intended use, it would not have required two people to close it; a single worker could have operated the basket, and no worker would have been placed in harm's way. He asserts the warped door of the cargo basket played a substantial part in bringing about or actually causing injury, and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.
We find the basket, even if unseaworthy, was not the proximate cause of Younce's injuries. Rather, the basket had already been used several times without incident prior to this accident. Younce testified the gate of the basket was closed prior to the basket's being lifted, and that once the pin was inserted the warping of the gate had no effect on the lifting of the basket. The gate did not open while the basket was lifted. Thus, the warped basket functioned properly.
Younce also argues that unseaworthiness arises from the negligence of the crew, specifically, Jack Hanley. The plaintiff points to Hanley's testimony that he lifts the loads irrespective of the location of the employees. The plaintiff also cites the testimony of Commander David Cole, an expert in marine safety, seamanship, cargo operations, vessel operations, United States Coast Guard regulations, and in casualty reporting and investigation. Cole testified that the crane operator is never supposed to take his eyes off the load when it is being lifted, has authority to stop or refuse to handle loads at all times, and should verify that all personnel are in the clear before starting the crane.
"An isolated act of operational negligence will not suffice to create an unseaworthy condition; rather, operational negligence must be `pervasive' or repeated frequently for it to rise to the level of an unseaworthy condition as in an `improper method of operation.'" Vendetto v. Sonat Offshore Drilling Co., XXXX-XXXX (La.1/20/99), 725 So.2d 474, 481.
Younce argues that Jack Hanley's apparent lack of knowledge of his duties and authority as a crane operator indicates his actions were not isolated but were and are committed on a repeated basisthus making the vessel unseaworthy by law. However, Younce had no proof that Hanley's actions have been repeated. To adopt Younce's argument that Hanley had a "history" of failing to safely operate a winch, based on Hanley's statements, would be mere speculation.
Accordingly, we conclude the trial court did not err in ruling that the basket, and the vessel, were not unseaworthy.
5. Maintenance and Cure
Younce contends the trial court committed reversible error when it failed to follow the uncontradicted findings of Younce's treating physician, Dr. John Watermeier, that Younce did not reach maximum medical *131 improvement on February 23, 1997. Younce asserts he is entitled to continuing maintenance and cure because none of his physicians has stated that he reached maximum medical improvement.
The trial court ruled that the plaintiff was not longer entitled to maintenance and cure because by February 1997, Dr. Watermeier's treatment of the neck and shoulder injuries was purely palliative. Because the court had determined that the knee and low back injuries are not attributable to this accident, the court ruled that PGM is not liable for maintenance and cure for those injuries.
"[T]he right to maintenance and cure must be construed liberally. . . ." "Cure" involves the payment of therapeutic, medical, and hospital expenses, that are not otherwise furnished to the seaman, until the point of maximum cure. "When maintenance and cure terminates is a question of fact to be determined on the evidence presented." The duty of the shipowner to furnish medical care continues until the sick or injured person has been cured or until the sickness or incapacity has been declared to be permanent. Maintenance and cure extends during the period when a seaman is incapacitated and continues until he reaches maximum medical recovery. It is the medical, not the judicial, determination of permanency that results in the termination of the right to maintenance and cure. "[M]aximum cure is achieved when it appears probable that further treatment will result in no [b]etterment of the seaman's condition." "Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." [Citations omitted.]
Dejean v. St. Charles Gaming Co., Inc., XXXX-XXXX (La.App. 3 Cir. 5/4/05), 903 So.2d 521, 523-524, writ denied, XXXX-XXXX (La.2/10/06), 924 So.2d 166.
A seaman is entitled to cure payments only until such time as he reaches maximum medical cure. Coulter v. Ingram Pipeline, Inc., 511 F.2d 735, 739 n. 4 (5th Cir.1975). Maximum medical cure is reached when no further improvement can be expected from further treatment and care of a continuing disability resulting from injuries sustained by a seaman. Coulter, id.
The cut-off date for both maintenance and cure is not the point at which the seaman recovers sufficiently to return to work. Rather, it is the date of maximum possible cure. Brown v. Aggie & Millie, Inc., 485 F.2d 1293, 1296 (5th Cir.1973). Maximum cure is achieved when it is probable that further treatment will result in no betterment of the seaman's condition. Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 530, 58 S.Ct. 651, 654, 82 L.Ed. 993, 998 (1938). Where it appears that the condition is incurable or that further treatment will merely relieve pain and suffering and not otherwise improve the physical condition, it is proper to declare the point of maximum cure. Pelotto v. L & N Towing Co., 604 F.2d 396, 404 (5th Cir.1979).
Considering the case law, we conclude the trial court was not clearly wrong in determining that Younce was not entitled to further maintenance and cure for the injuries attributable to this accident. Thus, like the trial court, we hold that issue of attorney's fees for failure to pay maintenance and cure is moot.
6. Loss of Earnings
Younce asserts the trial court committed manifest error in failing to award him *132 damages for his future loss of earning capacity, when the court found that Younce would not work again as a seaman.
PGM, on the other hand, contends the trial court committed manifest error in its calculation and assessment of lost earnings by basing his earning capacity on pre-tax earnings from a joint tax return which included his spouse's income, and in failing to provide a set-off for future earnings based on evidence of his actual 1998 employment.
In determining lost wages, the trial court selected the lower of the figures presented by Dr. Randolph Rice, plaintiff's economic expert. (The defense offered no figures to contradict those presented by Dr. Rice.) The court found there was no evidence the plaintiffs pre-injury earnings ever approached the higher figure, and the lower figure offered ($26,798.49 reflected in the plaintiff's 1995 tax return) was the highest actual yearly earnings figure presented. The court adopted the lower figure based on the 1995 income tax return, which the court felt "represents a more realistic view of the plaintiff's lost earnings capacity."
The trial court determined that one hundred percent of the plaintiff's lost wages up to February 1997 were attributable to the shoulder and cervical spine injuries, which the court found were related to the accident on the SUGAR ISLANDER. The court attributed fifty percent of the plaintiff's lost wages from February 1997 to his shoulder and cervical spine injuries. Dr. Rice testified that the plaintiffs past loss of earnings, based on the $26,798.49 figure, was $236,701.00, and that the plaintiff's future work-life expectancy from the date of trial was 12.94 years, so that his future loss of earnings, with the after-tax discounted value based on the $26,798.49 figure, was $271,574.00.
To support a claim for loss of earning capacity, a plaintiff need not show a loss of income as compared to his pre-accident income. However, he must show, by a preponderance of the evidence, that his ability to earn a living is impaired. We recognize that loss of earning capacity may be awarded to a plaintiff if the injury has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. . . .
Before a plaintiff can recover for loss of future earning capacity, he must prove the loss, not with mathematical certainty, but with reasonable certainty. Future loss of earnings is inherently speculative, and must be proved with a reasonable degree of certainty; purely conjectural or uncertain future loss earnings will not be allowed. [Footnotes and citations omitted.]
Burgard v. Allstate Ins. Co., 04-1394 (La. App. 5 Cir. 5/31/05), 904 So.2d 867, 879, writ denied, XXXX-XXXX (La.1/13/06), 920 So.2d 240.
The court awarded a total of $266,646.08 designated as "Lost Wages" in the judgment, without dividing into past and future loss of earnings or earning capacity.
The total of the figures for past and future lost wages, as calculated by Dr. Rice based on the 1995 tax return figure, was $372,488.00. The trial court, however, concluded that the plaintiff was entitled to full past loss earnings only to February 1997 and thereafter only fifty percent of his lost wages were attributable to the injuries from the accident involved in this case. We conclude the figure selected by the trial court, $266,646.08, was intended to include both past and future lost wages, based on the percentages the court found attributable to the accident here. The award also could have been intended to make up for the discrepancy in the 1995 *133 tax return, in which Mr. Younce's earnings were lumped with his former wife's, and no information was given to Dr. Rice to separate the overall income amount.
Considering that "future loss of earnings is inherently speculative," we find no manifest error in the court's determination. Burgard v. Allstate Ins. Co., supra.
7. Judicial Interest
Younce argues the trial court committed manifest error when it failed to award the plaintiff prejudgment interest in this matter. Younce contends the trial court also committed manifest error because the judgment was silent on an award to the plaintiff of judicial interest from the date of judicial demand. The plaintiff asserts, "based on the litigious nature in which defendant has prosecuted this matter," if this Court fails to make a specific award of interest from date of judicial demand, despite the clear case law PGM will contend it owes no such interest.
The trial court reasoned that because the "specific peculiarities which pervaded this entire litigation are too numerous to mention"including extensive delays due to changes in plaintiff's counsel, contentiousness between the parties, and lengthy discovery proceedingsthe "extraordinary delay in reaching an ultimate trial judgment" made it inequitable for the defendant to pay prejudgment interest.
We find no abuse of discretion by the trial court in that determination. Louisiana law provides that legal interest shall attach "from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts." La.R.S. 13:4203. In actions ex delicto, interest attaches automatically until the judgment is paid, whether prayed for in the petition or mentioned in the judgment. Thomas v. St. Charles Parish, 613 So.2d 698, 700 (La.App. 5 Cir.1993). Thus, under Louisiana law, when a judgment is silent regarding the award of interest, the plaintiff is entitled to be paid legal interest without formal amendment of the judgment.
In a Jones Act case, however, federal law controls the award of interest. Mihalopoulos v. Westwind Africa Line, 511 So.2d 771, 781 (La.App. 5 Cir.1987). The statute governing the payment of interest in civil cases in federal courts, 28 U.S.C. § 1961, provides that interest shall be calculated from the date of entry of the judgment. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, 97. Like federal courts, state courts hearing general maritime claims under the "saving to suitors" clause and Jones Act claims without a jury have the discretion to award prejudgment interest only on past damages. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, 97.
Recovery of prejudgment interest is prohibited in an action at law under the Jones Act. Theriot v. J. Ray McDermott & Co., 742 F.2d 877, 883 (5th Cir.1984). When a Jones Act claim is brought under the court's admiralty jurisdiction, and hence the case is tried to the court and not to the jury, the allowance of prejudgment interest is within the discretion of the trial court even if there is not a finding of unseaworthiness. Williams v. Reading & Bates Drilling Co., 750 F.2d 487, 491 (C.A.La.1985).
An award of prejudgment interest in state maritime cases is substantive in nature such that federal law controls.
Under federal law, a plaintiff's entitlement to prejudgment interest in a maritime case depends upon the nature of his claim, particularly the basis from which the federal court derives its subject matter jurisdiction. Federal courts derive *134 their maritime jurisdiction from either the constitutional and statutory grant of such power, referred to as "admiralty jurisdiction," or from conventional sources such as diversity or federal question.
If the court's jurisdiction is based solely upon conventional sources, such as federal question, the court applies federal law with respect to awarding interest. Since the statute governing the payment of interest in civil cases in federal courts, 28 U.S.C. § 1961, provides that interest shall be calculated from the date of entry of the judgment, prejudgment interest is generally prohibited in such maritime cases. As such, the courts have consistently refused to grant prejudgment interest on awards recovered under the Jones Act.
Nonetheless, there is an exception to this general rule. Even if the court hears a suit based solely upon federal question, it can sit in "admiralty" if the case is tried before a judge and not a jury. Thus, when an action is based strictly upon the Jones Act, prejudgment interest may be recovered as long as the case is tried to the court and the court exercises its admiralty jurisdiction. In the case at bar, the trial court, as the trier of fact, awarded prejudgment interest on the Jones Act award.
Likewise, where the court's power to hear a case arises from its admiralty jurisdiction, such as a general maritime action for unseaworthiness, the applicable substantive law is federal maritime law, which gives courts the discretion to award prejudgment interest.
In sum, federal courts have the discretion to award prejudgment interest on causes of action based upon their admiralty jurisdiction. However, courts have clearly chosen not to grant prejudgment interest on awards for future losses, including future earnings and future pain and suffering. The rationale underlying this rule being that "recovery of interest on losses not yet incurred effectively grants the recipient double recovery."
With these principles defined, it is clear that the trial court had discretion to grant Milstead prejudgment interest on the sums awarded as past damages in his general maritime and Jones Act claims. However, it had no authority to grant interest on the general maritime and Jones Act awards for future damages, be they future lost earnings or future pain and suffering, and the court of appeal erred in so finding.
The trial court did not apportion the sums awarded to the plaintiff. Thus, we remand this case to the trial court for a division of the judgment into past and future damages. In the trial court's discretion, prejudgment interest may be awarded only on past damages.
Milstead, 676 So.2d at 96-97.
As noted above, the trial judge set forth reasons for her decision to deny prejudgment interest. We find no abuse of discretion in those reasons. Nevertheless, by law the plaintiff is entitled to interest from the date of judgment and, to avoid further litigation of this point, we shall amend the judgment to provide for interest from the date of judgment.
8. Costs
Younce asserts the trial court committed manifest error when it failed to award the full expert costs of the experts who testified at trial of this matter. Younce attached bills of experts David Cole and Randolph Rice to his appellate brief. We cannot consider those, however, because there is nothing to indicate those bills were entered in evidence in the trial court, and this Court cannot accept evidence that is not part of the appellate *135 record. A Court of Appeal is a court of record, which must limit its review to evidence in the record before it. La.C.C.P. art. 2164; Black v. Anderson, 06-891 (La. App. 5 Cir. 3/13/07), 956 So.2d 20, 23, writ denied XXXX-XXXX (La.6/1/07), 957 So.2d 180.
DECREE
For the foregoing reasons, the judgment of the district court is amended to award legal interest from the date of the judgment. In all other respects, the judgment is affirmed.
AFFIRMED IN PART AND AMENDED IN PART.
NOTES
[1] The plaintiff originally filed suit in federal court under the Jones Act and general maritime law, but voluntarily transferred the case to state court under the saving-to-suitors clause of 28 U.S.C. § 1333, which allows a person injured in a maritime tort to sue for damages in a state court.
[2] Younce v. Pacific Gulf Marine, Inc., 01-546 (La.App. 5 Cir. 4/10/02), 817 So.2d 255, reversed and remanded, XXXX-XXXX (La. 10/4/02), 827 So.2d 1144.
[3] Younce v. Pacific Gulf Marine, Inc., 04-170 c/w 04-424 (La.App. 5 Cir. 9/28/2004), 883 So.2d 1154 (not designated for publication).
[4] Younce v. Pacific Gulf Marine, Inc., 04-839 (La.App. 5 Cir. 1/25/05), 893 So.2d 909.
[5] SIU is the Seafarers International Union.
[6] "[T]he rights of Jones Act seamen against their employers are fixed by the rules set forth in the Federal Employers' Liability Act. . . ." Prejean v. Industrial Cleanup, Inc., XXXX-XXXX (La. 12/1/98), 721 So.2d 1273, 1274.