ROBERT M. MURPHY, Judge.
| oThis case arises from the injury sustained by a plaintiff, Michael L. Scharfen-stein, while working as a linesman on the Mississippi River. Mr. Scharfenstein tore his rotator cuff when he attempted to flee from an anchor chain that was falling from Defendants’ ship. Defendants, Dalnave Navigation, Inc., Avena Shipping of Cyprus, and Assuranceforeningen Gard— Gjensidig, appeal a judgment, rendered after a trial on the merits, in favor of Mr. Scharfenstein.
In this appeal, Defendants argue the trial court erred in finding the prevention of Mr. Scharfenstein’s injury was foreseeable; finding Mr. Scharfenstein’s injury was substantially caused by their action; accepting Mr. Scharfenstein’s lost work-life expectancy; and in awarding excessive damages to Mr. Scharfenstein.
On cross appeal, Mr. Scharfenstein’s former wife, Ms. Scharfenstein, also a plaintiff in this action, argues the trial court erred when it rejected her loss of consortium claim. For the following reasons, we affirm the trial court’s judgment in favor of Mr. Scharfenstein and affirm the trial court’s judgment denying Ms. Scharfen-stein’s loss of consortium claim.
| ¿PROCEDURAL HISTORY
Plaintiffs filed their original petition against Defendants on December 3, 2007, alleging Defendants were liable to them under state law and under 33 U.S.C. § 905(B), the Longshore and Harbor Workers Compensation Act.
A bench trial was held on October 29, 2012. At the close of trial, the court took the matter under advisement. The trial court issued its judgment on this matter on January 28, 2013. In that judgment, the trial court found Mr. Scharfenstein was a Longshoreman; that the defendants bore 100% of the fault for causing plaintiffs injuries; and that defendants owed Mr. Scharfenstein damages in the amount of $705,494.50 for his outstanding medical bills; past and future lost wages; lost fringe benefits; past and future physical suffering and disability; and, past and future mental anguish and psychiatric disability. The trial court ordered that legal interest be paid on the outstanding medical bills, past lost wages, past physical pain, suffering and disability and past mental anguish and psychiatric disability, from the date of loss. The trial court also ordered legal interest to be paid on the remaining damages of future loss of wages, loss of fringe benefits, future physical pain, suffering and disability and future mental anguish and psychiatric disability, from the date of judicial demand. Finally, the trial court also denied Ms. Scharfenstein’s claim for loss of consortium.
On January 31, 2013, the trial court granted Defendants’ motion for appeal. In this appeal, Defendants assign as error the trial court’s findings as to foreseeability, causation, work-life expectancy, and general damages. The Defendants do not assign as error, the trial court’s finding *261 that Mr. Scharfenstein was a longshoreman at the time of the accident. On cross appeal, Plaintiffs contend that the trial court erred in denying Ms. Scharfenstein’s claim for loss of consortium.
| ¡¡FACTS
At trial, Mr. Scharfenstein testified that on the date of his injury, on or about April 12, 2006, Mr. Scharfenstein was working as a linesman for Cooper/T. Smith. That day, Mr. Scharfenstein was ordered to captain the Intrepid III, a small boat used as a mooring launch, to rendezvous with the M/V Server, an oceangoing ship, on the Mississippi River and to attach that ship’s lines to a mooring.
Mr. Scharfenstein began this job with two crew members, Lee Campo and David White. Mr. Scharfenstein testified his procedure is to first secure the starboard side lines, then to secure the lines on the ship’s port-side. The three men met the ship and attached its mooring lines. However, two lines on the ship’s portside detached from the mooring. The ship brought these two lines out of the water and back into the ship.
In a second attempt to secure the ship’s port-side mooring lines, Mr. Scharfenstein brought the Intrepid III back to a spot where the other crew members could grab the ship’s mooring lines. Mr. Scharfen-stein testified “we came back up, waited for the pilot to give us the okay.” The ship’s anchor chain was hanging straight down. Mr. Scharfenstein radioed the ship to ask “cap, is everything locked down?” The ship’s pilot gave him the okay, telling him “Yes.”[1] After receiving this confirmation, Mr. Scharfenstein waited until the ship lowered two mooring lines to a height of two to five feet above the water. He then navigated the Intrepid III to the lines. When the Intrepid III approached the ship, the ship was on the Intrepid Ill’s starboard side. When in position to grab these lines, the Intrepid III was between one and two feet from the ship’s anchor chain. There, his two crew members each grabbed a line.
IfiMr. Scharfenstein testified that he allowed his crew to grab these lines by hand rather than with a pole with a hook because he only uses the pole in unsafe situations. Mr. Scharfenstein gave an example of it being unsafe to bring the boat up to mooring lines near tight and stretched out anchor chains. Mr. Scharfenstein contrasted that situation from the situation on the day of his accident; this accident occurred when the ship’s anchor chain was almost straight down into the water.
The crew grabbed the lines near to the Intrepid Ill’s bow and began walking the lines to the stern in order to secure them. Mr. Scharfenstein was near the center of the boat with his left hand on the boat’s wheel and his right hand on its throttle. Almost immediately after the other crew members each grabbed a mooring line, the ship’s anchor chain began to fall. The links of the chain made a loud noise as they began to drop.
In response to this noise, Mr. Scharfen-stein testified that he knew something was going wrong, and, in an attempt to escape, he “slammed the throttle forward and tried to look up at the same time.” The dropping anchor chain frightened him. He had seen drops such as this before, but they were very rare. Mr. Scharfenstein testified that when he engaged in this maneuver he felt a pop in his right shoulder *262 and an instant pain. He felt as if he’d been shot or had been hit with a knife in his shoulder.[2] Mr. Scharfenstein attributed this pain to his movement slamming the throttle forward, not the Intrepid Ill’s subsequent acceleration. Mr. Scharfen-stein testified that this action caused his rotator cuff to tear.
After his response, despite his pain, Mr. Scharfenstein completed the job of mooring the ship. He then navigated the Intrepid III to the ship’s stern, picked up | fits captain, and returned to shore. After completing his mission, Mr. Scharfenstein went to the hospital.[3]
At the hospital, Dr. Hoffman diagnosed him with a torn rotator cuff in his right shoulder. Dr. Hoffman performed surgery on Mr. Scharfenstein’s shoulder in an attempt to repair his tear. Following his surgery, Mr. Scharfenstein underwent six months of physical therapy. He later returned to work where he initially performed light-duty work. Eventually, Mr. Scharfenstein returned to full duty work. However, after a few days of strenuous work, Mr. Scharfenstein testified he felt his shoulder was sore and that “something was once again wrong.” Mr. Scharfen-stein reported this pain to Cooper/T. Smith’s Vice-President, Ralph Verges and returned to Dr. Hoffman for further examination.
After examining Mr. Scharfenstein, Dr. Hoffman issued him restrictions that forbid him from lifting anything away from his body or over his head. Based on his physical condition and the restrictions he received from Dr. Hoffman, Mr. Scharfen-stein believed he could not return to work full time as a linesman. Mr. Scharfenstein testified that Cooper/T. Smith fired him after this because he was no longer able to do his job.[4]
Turning to the time since his injury and subsequent termination, Mr. Scharfenstein testified that there has not been a day when he didn’t know something was wrong with his shoulder. When he awakes each morning and cleans himself, he notices his shoulder “is not how it used to be.” When he stretches his right arm out while doing lawn work he can “feel” his shoulder. He | Sstated that if he hadn’t been hurt, he would “absolutely be tying up ships.”[5] He stated that he has continued doing lawn maintenance, but that this work makes it painful.
Despite this pain, Mr. Scharfenstein admitted that he did not see Dr. Hoffman regarding his shoulder between June of 2007 and December of 2010. In December of 2010, and then again in June of 2012, Mr. Scharfenstein went back to Dr. Hoffman to get a steroid shot in his shoulder. This temporarily alleviated Mr. Scharfen-stein’s shoulder pain. He also regularly *263 takes Advil and aspirin to deal with his pain.
Describing his family life, Mr. Scharfen-stein testified that, before his 2006 accident, he and his wife and children did “[p]retty much everything most good families do together, which is have fun and go out to eat, sports, camping, hiking.” For the most part he and his wife got along well. Prior to his 2006 accident, they never lived separate and apart and never sought marital counseling. Mr. Scharfen-stein testified that after his 2006 accident, he began to drink “too much” and began seeing Dr. Sandra Nieto who treated him for depression and sleep apnea. Mr. Scharfenstein also began seeing a psychiatrist, Dr. Mallary-Saleh, who prescribed him Prozac. Mr. Scharfenstein testified that he struggles every day to not “think about how good my life was” and how it changed “to what it is now.”
At trial, Defendants cross-examined Mr. Scharfenstein on his prior injuries. Mr. Scharfenstein testified relative to four pri- or injuries. The evidence clearly showed that two of these injuries did not relate to Mr. Scharfenstein’s 2006 rotator cuff tear. Those two injuries were Mr. Scharfen-stein’s broken finger in 1985 and 19his back injury in 2004 which was the result of a car accident. The two other injuries however were relevant.
Mr. Scharfenstein admitted that an accident report from his employer showed that he had an accident on July 18, 2000. The report stated Mr. Scharfenstein “was ascending the ladder from the barge ... to the walkway going to the shore. When Mike [Scharfenstein] reached the top of the ladder, he pulled himself up the ladder supports to step onto the walkway, and his right shoulder gave out.” Mr. Scharfen-stein testified that he did not remember this incident.
Mr. Scharfenstein also testified he tore his right rotator cuff in a previous accident on June 20, 2001. This injury occurred when he was “performing a mooring tie up” when he “threw the heaving line” back to a ship. Mr. Scharfenstein testified that this line was bigger than normal. He met Dr. Hoffman in connection with this injury and Dr. Hoffman performed surgery on him to repair this tear.
Mr. Scharfenstein testified that he worked light-duty assignments for five to six months following that injury, but he eventually returned to his job as a linesman. After his 2001 injury, before he went back to full-duty work as a linesman in February of 2002, he passed a test of his strength and ability to perform the linesman job. After he resumed his work, he did not have any other problems with his shoulder, and did not seek further medical treatment for that shoulder, until his 2006 accident.
David White testified he was a linesman employed by Cooper/T. Smith when Mr. Scharfenstein was injured on April 12, 2006. On the day of Mr. Scharfenstein’s accident, he, Mr. Scharfenstein and a Mr. Lee Campo were working on the Intrepid III. Mr. White confirmed that they approached the ship to retrieve its mooring line, and that when they were in position for this task, the 110Intrepid III was one or two feet away from the ship’s anchor chain. They needed to get this close to the anchor chain in order to grab the ship’s mooring line.
Mr. White testified: “I recall us being in position to take the lines from the ship, and then in — in a split second, the anchor chain started to drop very quickly, and I remember Mike [Scharfenstein] gunning the boat very — very quickly to get us out of harm’s way once the anchor chain started to go.” Mr. White further testified that if the anchor chain had hit the boat, “it’d *264 probably sink it, more — more than doubt sink [sic] the boat and ... hurt somebody very bad if the chain actually hits ... the person.”
Mr. White testified that it is not normal for the ship’s anchor chain to be let out while they were approaching the ship to grab its mooring line. Although Mr. White saw it done other times in his seven-year career, it was unsafe and wrong to let out a ship’s anchor chain as a boat was retrieving its mooring line. Mr. White did not observe Mr. Scharfenstein do anything with regard to his approach of the ship or the grabbing of the mooring line that caused or contributed to the chain falling. Mr. White testified that he knew Mr. Scharfenstein was a very good boat operator. He could not recall Mr. Scharfenstein ever putting him, or the boat, in an unsafe position.
Mr. White testified that when Mr. Scharfenstein “gunned the motors” that he yelled and seemed like he was in pain. Mr. White then demonstrated for the court, the movement Mr. Scharfenstein made on the Intrepid Ill’s throttle, a push forward with his right hand. Mr. White described Mr. Scharfenstein’s movement pushing the Intrepid Ill’s throttle forward as “violent and quick.” Mr. White opined that this movement was necessary because of the quickly dropping anchor chain. On cross examination, Mr. White testified that he did not fall after Mr. Scharfenstein pushed the Intrepid Ill’s throttles and caused it to move forward.
|nThe trial court also heard the testimony of Ralph Verges and B.W. Pittman regarding the Cooper/T. Smith operations and business.
Mr. Verges testified that at the time of Mr. Scharfenstein’s 2006 accident, he was the Mooring Department’s operations manager. Mr. Verges confirmed that it was standard procedure for the crew of a launch to communicate with the pilot of the ship they were planning to moor and for them to wait to receive orders from the pilot before taking the ship’s lines. Mr. Verges testified that there was no safety rule on how close a mooring launch can get to ship’s anchor chains. On Mr. Scharfen-stein himself, Mr. Verges also testified that Mr. Scharfenstein did light duty work for Cooper/T. Smith, helping to clean and drive when needed, after his 2006 injury and surgery. Mr. Verges also confirmed that after this period of light-duty work, Mr. Scharfenstein was fired because his permanent restrictions made him unable to perform the work his position required.
Mr. Pittman also confirmed that Mr. Scharfenstein returned to light-duty work for a brief period after his 2006 surgery. Mr. Pittman testified that, by the nature of the business, back and shoulder injuries were common among employees. Mr. Pittman attributed this to the lifting and straining that was required of the employees. A job description of Mr. Scharfen-stein’s position, accepted as an exhibit during Mr. Pittman’s testimony, stated, inter alia, that a linesman would be required to lift, carry, push, pull, and handle up to 80 pounds. That job description also stated that this work will be done using various parts of the body, including the shoulder. Finally, the job description required a linesman to be able to climb up to 75 feet.
|12On the aftermath of Mr. Seharfen-stein’s injury, and the damage it caused, the trial court also considered the testimony of Dr. Hoffman, Ms. Scharfenstein, Dr. Nieto, Mr. Hegwood and Dr. Rice.[6]
*265 Dr. Hoffman, an expert in the field of orthopedic surgery, testified regarding his treatment df Mr. Scharfenstein. Dr. Hoffman tested that prior to the 2006 accident, he had treated Mr. Scharfenstein in 2000 and 2001 for a shoulder injury.[7] Regarding Mr. Scharfenstein’s 2001 injury, Dr. Hoffman testified that Mr. Scharfenstein came to him on June 20, 2001, complaining that after throwing a cable line, he was experiencing shoulder pain. After examining him, Dr. Hoffman diagnosed Mr. Scharfenstein with a rotator cuff tear in his right shoulder. Dr. Hoffman treated this injury by surgery on August 3, 2001. Mr. Scharfenstein returned to full duty work on February 5, 2002.
On Mr. Scharfenstein’s 2006 injury, Dr. Hoffman testified that Mr. Scharfenstein’s description of his accident — that he sustained injury when he quickly “threw” the throttles forward to accelerate the boat— was consistent with the type of “jerking” action that could cause Mr. Scharfenstein’s torn rotator cuff injury. Dr. Hoffman also testified that yelling out in pain when throwing down the boat’s throttle was consistent with a person’s response to sustaining a rotator cuff injury. Dr. Hoffman concluded that, assuming Mr. Scharfen-stein injury occurred as described, his ro-tator cuff injury was caused by his April 12, 2006 accident.
Dr. Hoffman also concluded, within a reasonable medical probability, that Mr. Scharfenstein’s permanent restrictions and impairment were caused by the accident he described.
Dr. Hoffman also saw him after his surgery and subsequent return to work. Mr. Scharfenstein suffered from lingering pain, and Dr. Hoffman’s examination | ^revealed that Mr. Scharfenstein’s shoulder had not completely healed. After Dr. Hoffman released Mr. Scharfenstein back to work in January of 2007, Mr. Scharfenstein came back for more treatment because of a cumulative amount of pain, not for a single new incident which caused pain.
Upon this examination, Dr. Hoffman did not believe that another surgery would be in Mr. Scharfenstein’s best interest; so, he performed a functional capacity evaluation of Mr. Scharfenstein to determine his permanent limitations. This evaluation showed Mr. Scharfenstein was limited to lifting 90 pounds to the waist, 40 pounds to the shoulder. He could not lift anything away from his body or over his head; he also could not throw any object.
Mr. Scharfenstein continued to see Dr. Hoffman for pain in his shoulder, most recently, on June 6, 2012. Dr. Hoffman treated his shoulder with injections. Dr. Hoffman opined that Mr. Scharfenstein will likely continue to have pain in his shoulder and require additional treatment. Dr. Hoffman also informed the court that one of Mr. Scharfenstein’s injections costs $170. Dr. Hoffman also explained that Mr. Scharfenstein’s movements shown in the video introduced as Exhibit 21 are all within Mr. Scharfenstein’s restrictions.
With regard to the 2001 injury, Dr. Hoffman testified that Mr. Scharfenstein tore his supraspinatus tendon and that an examination related to that injury revealed signs that osteophytes (also referred to as bone spurs) were developing. Dr. Hoffman opined that “oftentimes those spurs can be an irritant to the supraspinatus [tendon] with regards to scratching it or wearing it.” Dr. Hoffman further opined that these spurs, through their fraying of tendons, will cause those tendons to fail *266 earlier than they otherwise would have. Dr. Hoffman repaired and smoothed out these bone spurs when he did his surgery in 2001. Dr. Hoffman | testified however that these bone spurs, in general, will return. Dr. Hoffman testified that in 2001, Mr. Scharfenstein’s injury was a “full thickness” tear of his tendon such that Dr. Hoffman had to reattach his tendon to the bone.
Regarding Mr. Scharfenstein’s recovery from his 2001 accident, Dr. Hoffman testified that between twenty and thirty percent of the people who undergo the type of surgery he had, who do medium-to-heavy-labor, will have that surgery fail and have their tendon tear again.
In regards to the 2006 injury, Dr. Hoffman testified that it was the exact same supraspinatus tendon in Mr. Scharfen-stein’s right shoulder that was injured. Mr. Scharfenstein’s MRI in connection with his 2006 injury revealed evidence of arthritis in that joint. In the 2006 surgery, Dr. Hoffman again shaved off some of Mr. Scharfenstein’s bone spurs.
Dr. Hoffman saw Mr. Scharfenstein through June 20, 2007, the date he issued him permanent restrictions. The next time Dr. Hoffman saw him was in December of 2010. In that December 2010 visit, Mr. Scharfenstein complained of tenderness in his shoulder’s AC joint, not his supraspinatus tendon. To treat this, Dr. Hoffman injected him with a mixture of cortisone and lidocaine.
On cross examination, Dr. Hoffman testified that if the “only” thing that happened was Mr. Scharfenstein’s push on the Intrepid Ill’s throttle, then that force alone would not be likely to have caused Mr. Scharfenstein’s injury. Dr. Hoffman further opined that if such a force had caused a person’s supraspinatus tendon to tear, that person’s tendon must have had a substantial amount of pre-existing fraying or deterioration. Dr. Hoffman also testified that if Mr. Scharfenstein’s tendon was so damaged and frayed, that, without surgery, the amount of time he could have continued to work would have been very limited: somewhere in the range of “weeks or months” not years.
115On re-direct examination, Dr. Hoffman was again presented with the scenario as explained by Mr. Scharfenstein. Dr. Hoffman testified that such a scenario could cause a rotator cuff tear. Dr. Hoffman reiterated that “quick jerking maneuvers tend to put tendons at risk.”
Cindy Scharfenstein testified about both Mr. Scharfenstein’s injury and their family and marital life. She and Mr. Scharfen-stein had three children together who were now all adults. Mr. Scharfenstein had worked for Cooper/T. Smith since the time they met when she was 16 years old. Mr. and Ms. Scharfenstein were married in April of 1982. Ms. Scharfenstein initially testified that Mr. Scharfenstein’s only prior injury that stopped him from working was when Mr. Scharfenstein broke his finger; Ms. Scharfenstein later remembered however that Mr. Scharfenstein tore his rotator cuff in 2001. Ms. Scharfenstein also recalled that “one time way back when” Mr. Scharfenstein fell off a boat and was hospitalized for 24 hours.
Prior to Mr. Scharfenstein’s accident in 2006, Mr. Scharfenstein “loved” his job and was a devoted father to his three daughters. Ms. Scharfenstein described camping trips the family took together. Before Mr. Scharfenstein’s accident, they never had marital problems that required counseling or divorce proceedings.
Ms. Scharfenstein stated that after the accident, Mr. Scharfenstein no longer attended their children’s school sporting events or engaged in the other family activities that they used to do. Ms. Schar- *267 fenstein described their relationship as “living together separately.” Ms. Schar-fenstein also stated that their personal intimacy stopped in 2006 or 2007.
According to Ms. Scharfenstein, Mr. Scharfenstein became depressed after losing his job. Mr. Scharfenstein lay “on the sofa all day” engaging in “no activity.” Mr. Scharfenstein began seeing a psychiatrist in 2006 or 2007. Ms. Scharfenstein thought this was because Mr. Scharfen-stein was depressed and | ^withdrawn. Ms. Scharfenstein testified that Mr. Schar-fenstein began drinking heavily when he did not before. Ms. Scharfenstein testified that Mr. Scharfenstein never suffered from depression, alcoholism, or sought mental health treatment before his accident. Ms. Scharfenstein attributed Mr. Scharfenstein’s withdrawal and depression as the main cause of their marriage’s failure. Ms. Scharfenstein testified that she divorced Mr. Scharfenstein in April of 2011.
Dr. Sandra Nieto, a treating physician of Mr. Scharfenstein, testified regarding her treatment of Mr. Scharfenstein after his accident.[8] Dr. Nieto testified that in 2007, Mr. Scharfenstein visited her complaining of fatigue. Dr. Nieto ordered Mr. Schar-fenstein to undergo a sleep study. That study confirmed Mr. Scharfenstein suffered from sleep apnea. Dr. Nieto opined that this sleep apnea may have caused Mr. Scharfenstein’s fatigue.[9] For treatment, Dr. Nieto recommended that he sleep with a CPAP mask. Dr. Nieto however testified that Mr. Scharfenstein could not tolerate this treatment and only used his mask only for five nights.
Dr. Nieto opined that sleep apnea may occur or worsen due to weight gain, alcohol consumption, and aging. Dr. Nieto testified that left untreated, sleep apnea can result in additional fatigue, depression, high blood pressure, heart disease, and lung disease. Dr. Nieto last saw Mr. Scharfenstein in March of 2009 when he complained of high blood pressure, sleep apnea, obesity, hyperlipidemia, and erectile dysfunction.
117Mr. Hegwood, an expert in vocational rehabilitation counseling, met with Mr. Scharfenstein on July 29, 2010, and conducted a vocational assessment.
Mr. Hegwood testified to the impact of the restrictions Dr. Hoffman imposed on Mr. Scharfenstein. As to Mr. Scharfen-stein’s current employment in grass cutting, Mr. Hegwood testified that “it’s within his functional limitations and his academic abilities’....”[10] These restrictions did not prevent Mr. Scharfenstein from continuing his lawn care business, *268 which he began before he was injured “because it didn’t require his functional pushing and pulling away from or lifting overhead.... ” However, Mr. Hegwood testified that Mr. Scharfenstein could not resume work as a boat operator because that job would require him to do lifting that Dr. Hoffman has restricted him from doing. Mr. Scharfenstein’s previous job required “a lot of climbing ... pushing [and ... ] pulling ... all the time.”
Mr. Hegwood testified that other possible jobs that Mr. Scharfenstein could have taken would have kept Mr. Scharfenstein at approximately the same earning capacity. Mr. Hegwood opined that, if the jobs were offered to him, Mr. Scharfenstein could perform the work of a dispatcher, dock-clerk, or forklift operator. Mr. Heg-wood testified that while there are possibilities that Mr. Scharfenstein could obtain other employment, it was more likely than not, given Mr. Scharfenstein’s educational, medical, and employment history, that Mr. Scharfenstein was appropriately employed doing his lawn-maintenance work.
Plaintiffs also presented the testimony of Dr. Randolph Rice, an expert in economics. Dr. Rice testified, based on his expertise and statistics provided by the department of labor, that Mr. Scharfen-stein lost a work-life expectancy of 9.68 years. Dr. Rice then calculated the present value of Mr. Scharfenstein’s lost future earnings. In making this calculation, Dr. Rice considered both the amount Mr. | ^Scharfenstein made in his lawn care business and the earnings estimates provided to him by Barney Hegwood. On cross examination, Dr. Rice admitted that when he calculated Mr. Scharfenstein’s work-life expectancy, he had not incorporated the future risk posed to Mr. Schar-fenstein by his 2001 injury and surgery. When Defendants asked Dr. Rice to calculate Mr. Scharfenstein’s loss of future earnings based on an alternative work-life expectancy of a fewer number of years, Dr. Rice complied. However, he testified that he did not know whether this alternative lower work-life expectancy was a reliable expectation of Mr. Scharfenstein.

DISCUSSION

As an initial matter, we recognize that review of the Plaintiffs’ claims requires this Court to distinguish between substantive and procedural issues of law. In this matter, procedural issues are governed by Louisiana law and substantive issues are governed by federal maritime law.
On substantive issues, federal maritime law applies because Mr. Scharfenstein’s injuries occurred during his attempt to secure the mooring lines of Defendants’ ship on the Mississippi River, a navigable waterway. See Creppel v. Shell Oil Co., 738 F.2d 699, 701 (5th Cir.1984) (torts occurring in navigable waters are governed by maritime law). A state court is required to apply federal maritime law in a case within federal admiralty jurisdiction. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); Dean v. Ramos Corp., 00-1621 (La.App. 5 Cir. 2/28/01), 781 So.2d 796, 800.
The trial court below determined that Scharfenstein’s work status was that of a longshoreman as defined under Longshore and Harbor Workers’ Compensation Act (“LHWCA”), 33 U.S.C.A. § 901, et seq. That finding was not appealed. Pursuant to the LHWCA, when there is an injury of a longshoreman:
[iaBy the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accor *269 dance with the provisions of section 933 of this title.
33 U.S.C.A. § 905(b).
Mr. Scharfenstein, as a longshoreman, brought such a claim of vessel negligence against Defendants. The elements of this maritime negligence cause of action are essentially the same as land-based negligence under the common law; there are no special procedures. Withhart v. Otto Candies, L.L.C., 431 F.3d 840, 842 (5th Cir.2005); see also Use v. Use, 94-972 (La.App. 1 Cir. 4/7/95), 654 So.2d 1355, 1359 n. 2, writ denied, 95-1879 (La.1995), 662 So.2d 468.
To prove his negligence claim, Mr. Scharfenstein must demonstrate that there was a duty, the defendants breached that duty, he suffered an injury, and that Defendants’ conduct caused his injury. Dean v. Ramos Corp., 00-1621 (La.App. 5 Cir. 2/28/01), 781 So.2d 796, 802; In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 210-11 (5th Cir.2010). Furthermore, the resulting harm must be reasonably foreseeable. In re: Cooper/T. Smith v. Gnots-Reserve, 929 F.2d 1073, 1077 (5th Cir.1991), cert. den. sub nom Abshire v. Gnots-Reserve, Inc., 502 U.S. 865, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991); Use, supra, 654 So.2d at 1365. “These standards are not remarkably different from [Louisiana] standards, except that state law would apply a “duty/risk” analysis, rather than a “reasonably foreseeable” analysis.” Id.
On procedural issues however, such as our standard of review, Louisiana law governs. Dean, supra, 781 So.2d at 803. The assignments of error raised in this appeal require this Court to apply both a de novo and a manifest error standard of review.
| ^Defendants’ first assignment argues the trial court erred in its determination that they owed Mr. Scharfenstein a duty to protect against the harm he suffered. We recognize that the determination of the tortfeasor’s duty is a question of law and thus a function of the court that we review de novo. Faulkner v. McCarty Corp., 02-1337, p. 2 (La.App. 4 Cir. 6/11/03), 853 So.2d 24, 27 (duty is a question of law that is subject to de novo review on appeal).
However, Defendants’ remaining assignment of errors, and the Plaintiffs’ cross appeal, present questions of fact. In their second, third, and fourth assignments of error, defendants contend that the trial court erred in determining that Defendants’ actions were the substantial cause of Mr. Scharfenstein’s injuries; accepting the plaintiffs calculation of lost work-life expectancy; and in awarding Mr. Scharfen-stein an excessive amount of general damages. On cross appeal, Ms. Scharfenstein complains the trial court erred in denying her loss of consortium claim. See Landry v. Oceanic Contractors, Inc., 731 F.2d 299, 302 (5th Cir.1984) (questions of negligence and causation in admiralty cases are treated as fact questions).
As this Court explained in Dean,
Louisiana courts of appeal apply the state manifest error standard of review [to such questions of fact] in general maritime and Jones Act cases. [Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, 96]; Domonter v. C.F. Bean Corp., 99-1204 (La.App. 5th Cir.4/25/00), 761 So.2d 629, 637, writ denied, 00-1872 (La.9/29/00), 770 So.2d 354. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and *270 inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989); Domonter, 761 So.2d at 637. The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether his conclusion was a reasonable one. Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993); Domonter, 761 So.2d at 637. Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882; Domonter, 761 So.2d at 637. However, where documents or objective evidence so contradicts a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error, even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45; Domonter, 761 So.2d at 637.
Dean, supra, 781 So.2d at 803.[11]

Assignment One

In their first assignment, Defendants argue the trial court erred when it determined that Mr. Scharfenstein’s injury was a foreseeable consequence of the act of dropping the anchor chain.
Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances. Daigle v. Point Landing, Inc., 616 F.2d 825, 827 (5th Cir.1980). The determination of the existence and scope of a duty “involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party.” Consolidated Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 67 (5th Cir.1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). Duty “may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct.” Id.
In the context of maritime torts, we “consider harm to be a foreseeable consequence of an act or omission ‘if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the. act or omission, considering the interplay of natural forces and likely human intervention.’ ” In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 211 (5th Cir.2010) (quoting Consol. Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 68 (5th Cir.1987)). Thus, if the injuries Mr. Scharfenstein suffered as a result of the dropping of the anchor chain were not foreseeable, then, as a matter of law, Defendants owed no duty to Mr. Scharfenstein. However, that is not the case here.
We agree with the trial court that it is foreseeable that an injury could be caused to a person trying to quickly escape an anchor chain that was falling unexpectedly. A reasonably thoughtful person would take into account this risk and avoid dropping the ship’s anchor when a boat, such as the Intrepid III, was so near to that anchor. Therefore, Defendants owed a duty to protect against this risk. Ac *271 cordingly, we find Defendants’ first assignment of error to be without merit.

Assignment Two

In their second assignment, Defendants argue the trial court erred in finding the act of dropping the anchor chain was a “substantial moving cause” of Mr. Schar-fenstein’s shoulder injury.[12]
Defendants assert this element was defeated by Dr. Hoffman’s testimony that the mere force required to push a throttle forward by a hypothetical person would probably not cause that person to suffer a rotator cuff tear. In his testimony however, Dr. Hoffman clarified that Mr. Scharfenstein’s slamming the throttle, combined with his quick jerking movement and looking up probably did cause his rota-tor cuff tear. After reviewing Dr. Hoffman’s testimony at trial, we find the trial court did not manifestly err in finding Mr. Scharfenstein’s act in response to the Igjfalling anchor chain was a substantial moving cause of his shoulder injury. Accordingly, this assignment also lacks merit.

Assignment Three

Next, Defendants argue the trial court “erred in calculating Mr. Scharfenstein’s loss of earnings, since the work-life expectancy calculation relied upon the court was not reasonably supported by the record.” As to this assignment, we again recognize that we review determinations of fact such as this for manifest error. D'Ambrosia v. Lang, 07-298 (La.App. 5 Cir. 4/29/08), 985 So.2d 800, 820.
Here, in determining the work-life expectancy of Mr. Scharfenstein, the trial court considered the testimony of the Plaintiffs’ expert in economics, Dr. Randolph Rice, and Barney Hegwood, a vocational counselor.
In their argument to this Court, Defendants contend that the trial court erred in accepting the above work-life expectancy of Dr. Rice and that the trial court should have accepted instead a work-life expectancy offered by Dr. Hoffman of “weeks or months, not years.” We do not agree that Dr. Hoffman provided such a work-life expectancy relative to Mr. Schar-fenstein.
At trial, Dr. Hoffman testified that the mere force required to push a throttle forward would not. likely cause a rotator cuff tear unless a person had severe previous damage to his or her rotator cuff. Dr. Hoffman quickly clarified that such a mere push was not the situation described by Mr. Scharfenstein; rather, Mr. Scharfen-stein engaged in a quick, jerking motion. Dr. Hoffman opined that Mr. Scharfen-stein’s motion was the type that could, and likely did, cause his injury. Considering this testimony, the trial court rejected Defendants argument that Mr. Scharfenstein had a work-life expectancy limited to weeks or months at the time of his accident.
*272 124The trial court accepted the testimony of Dr. Rice as credible on this issue. Dr. Rice was accepted by the trial court as an expert and Defendants were able to cross-examine him on his methodology. Dr. Rice testified that Mr. Scharfenstein had a lost work-life expectancy of 9.68 years. Defendants offered no evidence, which related more specifically to Mr. Seharfen-stein, to prove an alternative work-life expectancy. Considering this, we find that the trial court had a reasonable basis in the record for its finding. Accordingly, this assignment also lacks merit.

Assignment Four

In their final assignment of error, Defendants argue that trial court awarded excessive general damages. The standard for the review of damage awards is whether, after an articulated analysis of the facts, the appellate court finds that the trial judge abused his or her great discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). This determination is made with consideration to the individual circumstances of the injured plaintiff. Id. After an analysis of the facts and circumstances peculiar to the particular case and the particular plaintiff, an appellate court may conclude that the award is inadequate or excessive. Id. Only then does the appellate court resort to prior awards, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Id.; see also Farrell v. Pierre, 02-1136 (La.App.5 Cir.4/8/03), 846 So.2d 49, 55.
Here, the trial court gave detailed reasons for its award of damages, stating:
With regard to past and future physical pain, suffering and disability and past and future mental anguish and psychiatric disability, the defendants point to cases with a range of $50,000.00-$150,000.00 in damages, while the plaintiffs cite cases awarding over $300,000.00. The facts show that Mr. Scharfenstein suffered a torn rotator cuff as a result of the April 12, 2006 accident. He underwent surgery. The surgery failed. He is no longer able to perform his duties as a lineman. He continues to receive injections from Dr. Hoffman for shoulder pain. The plaintiffs medical records demonstrate other medical causes 125for the depression that the plaintiff suffers. Dr. Nieto, the plaintiffs physician, discovered that Mr. Scharfenstein suffered from severe obstructive sleep apnea and was consuming excessive alcohol. She noted the depression to be sporadic and attributed it to the sleep apnea and alcohol use. She recommended that Mr. Schar-fenstein reduce his alcohol intake and utilize a CPAP machine. Mr. Scharfen-stein failed to comply with the recommendation to use a CPAP machine.
Mr. Scharfenstein was also treated by Dr. Mallary-Saleh for depression. She noted a family history of depression and cited his anger and resentment towards Cooper/T. Smith for his job loss as causes of his depression. The accident was not mentioned as a cause of the depression, but there is a connection between his job loss and the April 12, 2006 injury.
Considering the cases cited by the plaintiffs and defendants in their memoranda, the case of Knower v. Peranio, 678 So.2d 574 ([La.App.] 5th Cir.1996), the testimony of the witnesses and parties, and the depositions of Dr. Nieto and Dr. Mallary-Saleh, the Court awards the following:
*273 Past physical pain, suffering and disability $125,000.00
Future physical pain, suffering and disability $ 75,000.00
Past mental anguish and psychiatric disability $ 35,000.00
Future mental anguish and psychiatric disability $ 15,000.00
In considering the damage inflicted on Mr. Scharfenstein due to his accident, we cannot say the trial court’s award, above, was grossly excessive.
In Knower v. Peranio, 96-105 (La.App. 5 Cir. 7/1/96), 678 So.2d 574, writ denied, 96-2004 (La.11/8/96), 683 So.2d 270, evidence supported an award of $125,000 to a plaintiff-customer who slipped and fell in solution that the defendant service station used to clean its concrete surface. The customer suffered a torn rotator cuff. The customer underwent surgery for this injury but did not recover his full range of motion and remained in need of further treatment; the use of his right arm was still impaired. In reference to the trial court’s $125,000.00, this |2fiCourt stated that “while likely in the high range, it appears that this award was within the trial judge’s discretion.” Id. at 576.[13]
In Caskey v. Merrick Const. Co., Inc., 46,886 (La.App. 2 Cir. 3/14/12), 86 So.3d 186, 201, writ denied, 12-0847 (La.6/1/12), 90 So.3d 442, the Second Circuit affirmed an award of $150,000.00 for pain, suffering, mental anguish and distress and disability and $25,000.00 for loss of enjoyment or quality of life to a plaintiff whose ear accident aggravated his pre-existing back condition. In its decision, the Second Circuit pointed to evidence showing the pain the plaintiff suffered, and his required medication, that pain, doubled. Id. at 199. This pain limited the plaintiff’s movement, activity with his grandchildren, and usual life activities such as intimate relations with his wife, hunting, fishing, traveling, gardening, and helping out around the house. Id. at 200. The plaintiffs doctor opined that the plaintiff could not have back surgery because of other health conditions and that the plaintiff would suffer this increased pain for the remainder of his life. Id. at 199.
Here, the evidence at trial showed that Mr. Scharfenstein suffered a serious injury which required surgery, caused his depression, decreased his enjoyment of life, and will cause him pain for the rest of his life. After reviewing the evidence in this case and studying the previous cases, we find that the trial court did not abuse its discretion in its award of general damages to Mr. Scharfenstein.

Cross Appeal

In addition to refuting the above assignment of errors, Plaintiffs in this matter also appeal the trial court’s rejection of Ms. Scharfenstein’s claim for damages for loss of consortium. The trial court rejected Ms. Scharfenstein’s claim ^because it found that there was insufficient evidence to demonstrate her marital problems were caused by Mr. Scharfenstein’s 2006 accident. We find the evidence does not merit an award for loss of consortium and the trial judge was not manifestly erroneous on this question of fact. See Buckheister v. United States Envtl. Serv., L.L.C., 11- *274 1148 (La.App. 5 Cir. 5/31/12), 97 So.3d 414, writ denied, 12-1462 (La.10/8/12), 98 So.3d 861.

CONCLUSION

For the foregoing reasons, we affirm the trial court’s judgment in favor of Mr. Scharfenstein and against Defendants and affirm the trial court’s denial of Ms. Schar-fenstein’s claim for loss of consortium.

AFFIRMED.

. Mr. Scharfenstein also testified that it was common practice for him to ask the ship he was planning to moor whether its anchors were locked or whether the ship intended to use its anchors. Mr. Scharfenstein testified that he only approached ships after he received confirmation that its anchors were secured.

. As to his pushing of the throttle in this incident, Mr. Scharfenstein testified that pushing the throttle was part of his job duties.

. Mr. Scharfenstein testified that he filled out an accident report following the incident that describes substantially the same events as testified to by Mr. Scharfenstein at trial. Mr. Scharfenstein testified that he also described his accident to an adjuster in May of 2006. Mr. Scharfenstein testified that the description contained in the adjuster's report described his accident as he remembered it.

. The Court admitted into the record, Exhibit 10, the “Payroll Status Change Notice.” This showed Mr. Scharfenstein was terminated from his job.

. At trial, Mr. Scharfenstein also testified he began working for Cooper/T. Smith in 1977, a short time after he graduated from high school. Mr. Scharfenstein testified that in the almost 30 thirty years he worked for Cooper/T. Smith, he was a “lineman” with his duty being to moor ships.

. The court considered the testimony of these witnesses in addition to Mr. Scharfenstein’s own testimony.

. Dr. Hoffman also testified that he saw Mr. Scharfenstein in 2004 for an injury unrelated to his shoulder.

. Dr. Nieto testified that she first saw Mr. Scharfenstein on April 1, 2004 for pain, which was unrelated to his right shoulder. Dr. Nieto testified that Mr. Scharfenstein visited her on that date complaining of pain from a motor vehicle accident which occurred on March 27, 2004. Dr. Nieto’s examination that day revealed Mr. Scharfenstein had various problems with his spine. For treatment, Dr. Nieto prescribed Mr. Scharfen-stein a muscle relaxer and advised him to continue taking Advil and avoid heavy lifting. Mr. Scharfenstein again visited Dr. Nieto, complaining of back pain, on April 14 and 17 of 2004. Dr. Nieto testified the pain Mr. Scharfenstein was complaining of was not related to his right shoulder. Mr. Scharfen-stein returned to Dr. Nieto twice in September of 2004.

. Testing also revealed Mr. Scharfenstein had slightly abnormal liver function. Dr. Nieto recommended he decrease his consumption of Tylenol and alcohol. An examination after this recommendation revealed a slight improvement in Mr. Scharfenstein's liver function.

. Video clips showing Mr. Scharfenstein performing lawn work were admitted and published for the jury.

. Because the standard of appellate review is substantially similar in federal court, we use federal appellate cases to inform our analysis. See Miss. Dep't of Transp. v. Signal Int’l LLC (In re Signal Int’l LLC), 579 F.3d 478, 490 (5th Cir.2009); In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 211 (5th Cir.2010); and Johnson v. Cenac Towing, Inc., 544 F.3d 296, 303 (5th Cir.2008). ("In a bench tried admiralty case, a district court's findings concerning negligence and causation are findings of fact reviewable by this court only for clear error.... We entertain a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently.”)

. To the extent that Defendants, in this assignment of error, again argue Mr. Scharfenstein’s injuries were not within the Defendants’ duty, we pretermit discussion of this assignment as we have decided the question of duty in our discussion of Defendants' first assignment. See Chavez v. Noble Drilling Corp., 567 F.2d 287, 289 (5th Cir.1978) (“the defendant’s negligence must be a substantial factor in bringing about the harm, with no rule of law relieving the actor of fault. ‘Substantial’ means more than ‘but for’ the negligence, the harm would not have resulted, and more than merely negligible negligence. The gist of it is that some responsibility for the effect must accompany the cause. The Fifth Circuit 'legal cause' standard thus involves the concept of duty, or 'legally protected interest.’ ” (internal citations omitted)).

. A review of Knower reveals that the $125,000.00 award to the customer was justified by both the customer's past and continuing pain. Additionally, the plaintiff-customer in Knower did not experience any mental anguish or psychiatric disability.